[No. S015637. Apr. 22, 1991.]

COUNTY OF FRESNO, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

**COUNSEL**

Max E. Robinson, County Counsel, and Pamela A. Stone, Deputy County Counsel, for Plaintiff and Appellant.

B. C. Barnum, County Counsel (Kern), and Patricia J. Randolph, Deputy County Counsel, as Amici Curiae on behalf of Plaintiff and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, N. Eugene Hill, Assistant Attorney General, and Richard M. Frank, Deputy Attorney General, for Defendants and Respondents.

## OPINION

MOSK, J.—We granted review in this proceeding to decide whether section 17556, subdivision (d), of the Government Code (section 17556(d)) is facially valid under article XIII B, section 6, of the California Constitution (article XIII B, section 6).

Article XIII B, section 6, provides: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service, except that the Legislature may, but need not, provide such subvention of funds for the following mandates: [¶] (a) Legislative mandates requested by the local agency affected; [¶] (b) Legislation defining a new crime or changing an existing definition of a crime; or [¶] (c) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975."

The Legislature enacted Government Code sections 17500 through 17630 to implement article XIII B, section 6. (Gov. Code, § 17500.) It created a "quasi-judicial body" (*ibid.*) called the Commission on State Mandates (commission) (*id.*, § 17525) to "hear and decide upon [any] claim" by a local government that the local government "is entitled to be reimbursed by the state for costs" as required by article XIII B, section 6. (Gov. Code, § 17551, subd. (a).) It defined "costs" as "costs mandated by the state"— "any increased costs" that the local government "is required to incur . . . as a result of any statute . . . , or any executive order implementing any statute . . . , which mandates a new program or higher level of service of any existing program" within the meaning of article XIII B, section 6. (Gov. Code, § 17514.) Finally, in section 17556(d) it declared that "The commission shall not find costs mandated by the state . . . if, after a hearing, the commission finds that" the local government "has the authority to levy service charges, fees, or assessments sufficient to pay for the mandated program or increased level of service."

For the reasons discussed below, we conclude that section 17556(d) is facially constitutional under article XIII B, section 6.

## I. FACTS AND PROCEDURAL HISTORY

The present proceeding arose after the Legislature enacted the Hazardous Materials Release Response Plans and Inventory Act (Act). (Health & Saf. Code, § 25500 et seq.) The Act establishes minimum statewide standards for business and area plans relating to the handling and release or threatened release of hazardous materials. (*Id.*, § 25500.) It requires local governments to implement its provisions. (*Id.*, § 25502.) To cover the costs they may incur, it authorizes them to collect fees from those who handle hazardous materials. (*Id.*, § 25513.)

The County of Fresno (County) implemented the Act but chose not to impose the authorized fees. Instead, it filed a so-called "test" or initial claim with the commission (Gov. Code, § 17521) seeking reimbursement from the State of California (State) under article XIII B, section 6. After a hearing, the commission rejected the claim. In its statement of decision, the commission made the following findings, among others: the Act constituted a "new program"; the County did indeed incur increased costs; but because it had authority under the Act to levy fees sufficient to cover such costs, section 17556(d) prohibited a finding of reimbursable costs.

The County then filed a petition for writ of mandate and complaint for declaratory relief against the State, the commission, and others, seeking vacation of the commission's decision and a declaration that section 17556(d) is unconstitutional under article XIII B, section 6. While the matter was pending, the commission amended its statement of decision to include another basis for denial of the test claim: the Act did not constitute a "program" under the rationale of *County of Los Angeles* v. *State of California* (1987) 43 Cal.3d 46 [233 Cal.Rptr. 38, 729 P.2d 202] (*County of Los Angeles*), because it did not impose unique requirements on local governments.

After a hearing, the trial court denied the petition and effectively dismissed the complaint. It determined, inter alia, that mandate under Code of Civil Procedure section 1094.5 was the County's sole remedy, and that the commission was the sole properly named respondent. It also determined that section 17556(d) is constitutional under article XIII B, section 6. It did not address the question whether the Act constituted a "program" under *County of Los Angeles*. Judgment was entered accordingly.

The Court of Appeal affirmed. It held the Act did indeed constitute a "program" under *County of Los Angeles, supra,* 43 Cal.3d 46. It also held section 17556(d) is constitutional under article XIII B, section 6.

■ We granted review to decide a single issue, i.e., whether section 17556(d) is facially constitutional under article XIII B, section 6.

## II. DISCUSSION

We begin our analysis with the California Constitution. At the June 6, 1978, Primary Election, article XIII A was added to the Constitution through the adoption of Proposition 13, an initiative measure aimed at controlling ad valorem property taxes and the imposition of new "special taxes." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 231-232 [149 Cal.Rptr. 239, 583 P.2d 1281].) The constitutional provision imposes a limit on the power of state and local governments to adopt and levy taxes. (*City of Sacramento* v. *State of California* (1990) 50 Cal.3d 51, 59, fn. 1 [266 Cal.Rptr. 139, 785 P.2d 522] (*City of Sacramento*).)

At the November 6, 1979, Special Statewide Election, article XIII B was added to the Constitution through the adoption of Proposition 4, another initiative measure. That measure places limitations on the ability of both state and local governments to appropriate funds for expenditures.

"Articles XIII A and XIII B work in tandem, together restricting California governments' power both to levy and to spend [taxes] for public purposes." (*City of Sacramento, supra,* 50 Cal.3d at p. 59, fn. 1.)

Article XIII B of the Constitution was intended to apply to taxation—specifically, to provide "permanent protection for taxpayers from excessive taxation" and "a reasonable way to provide discipline in tax spending at state and local levels." (See *County of Placer* v. *Corin* (1980) 113 Cal.App.3d 443, 446 [170 Cal.Rptr. 232], quoting and following Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Special Statewide Elec. (Nov. 6, 1979), argument in favor of Prop. 4, p. 18.) To this end, it establishes an "appropriations limit" for both state and local governments (Cal. Const., art. XIII B, § 8, subd. (h)) and allows no "appropriations subject to limitation" in excess thereof (*id.*, § 2). (See *County of Placer* v. *Corin, supra,* 113 Cal.App.3d at p. 446.) It defines the relevant "appropriations subject to limitation" as "any authorization to expend during a fiscal year the proceeds of taxes . . . ." (Cal. Const., art. XIII B, § 8, subd. (b).) It defines "proceeds of taxes" as including "all tax revenues and the proceeds to . . . government from," inter alia, "regulatory licenses, user charges, and user fees *to the extent that such proceeds exceed the costs reasonably borne by [government] in providing the regulation, product, or service . . . .*" (Cal. Const., art. XIII B, § 8, subd. (c), italics added.) Such "excess" proceeds from "licenses," "charges," and "fees" "are but

*taxes*" for purposes here. (*County of Placer* v. *Corin, supra,* 113 Cal.App.3d at p. 451, italics in original.)

Article XIII B of the Constitution, however, was not intended to reach beyond taxation. That fact is apparent from the language of the measure. It is confirmed by its history. In his analysis, the Legislative Analyst declared that Proposition 4 "would not restrict the growth in appropriations financed from other [i.e., nontax] sources of revenue, including federal funds, bond funds, traffic fines, user fees based on reasonable costs, and income from gifts." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Special Statewide Elec. (Nov. 6, 1979), analysis by Legislative Analyst, p. 16.)

Section 6 was included in article XIII B in recognition that article XIII A of the Constitution severely restricted the taxing powers of local governments. (See *County of Los Angeles, supra,* 43 Cal.3d at p. 61.) The provision was intended to preclude the state from shifting financial responsibility for carrying out governmental functions onto local entities that were ill equipped to handle the task. (*Ibid.;* see *Lucia Mar Unified School Dist.* v. *Honig* (1988) 44 Cal.3d 830, 836, fn. 6 [244 Cal.Rptr. 677, 750 P.2d 318].) Specifically, it was designed to protect the tax revenues of local governments from state mandates that would require expenditure of such revenues. Thus, although its language broadly declares that the "state shall provide a subvention of funds to reimburse . . . local government for the costs [of a state-mandated new] program or higher level of service," read in its textual and historical context section 6 of article XIII B requires subvention only when the costs in question can be recovered *solely from tax revenues.*

In view of the foregoing analysis, the question of the facial constitutionality of section 17556(d) under article XIII B, section 6, can be readily resolved. As noted, the statute provides that "The commission shall not find costs mandated by the state . . . if, after a hearing, the commission finds that" the local government "has the authority to levy service charges, fees, or assessments sufficient to pay for the mandated program or increased level of service." Considered within its context, the section effectively construes the term "costs" in the constitutional provision as excluding expenses that are recoverable from sources other than taxes. Such a construction is altogether sound. As the discussion makes clear, the Constitution requires reimbursement only for those expenses that are recoverable solely from taxes. It follows that section 17556(d) is facially constitutional under article XIII B, section 6.

The County argues to the contrary. It maintains that section 17556(d) in essence creates a new exception to the reimbursement requirement of article

XIII B, section 6, for self-financing programs and that the Legislature cannot create exceptions to the reimbursement requirement beyond those enumerated in the Constitution.

We do not agree that in enacting section 17556(d) the Legislature created a new exception to the reimbursement requirement of article XIII B, section 6. As explained, the Legislature effectively—and properly—construed the term "costs" as excluding expenses that are recoverable from sources other than taxes. In a word, such expenses are outside of the scope of the requirement. Therefore, they need not be explicitly excepted from its reach.

The County nevertheless argues that no matter how characterized, section 17556(d) is indeed inconsistent with article XIII B, section 6. Its contention is in substance as follows: the source of section 17556(d) is former Revenue and Taxation Code section 2253.2; at the time of Proposition 4, subdivision (b)(4) of that former section stated that the State Board of Control shall not allow a claim for reimbursement of costs mandated by the state if the legislation contains a self-financing authority; the drafters of Proposition 4 incorporated some of the provisions of former Revenue and Taxation Code section 2253.2 into article XIII B, section 6, but did not incorporate former subdivision (b)(4); their failure to do so reveals an intent to treat as immaterial the presence or absence of a "self-financing" provision; and such an intent is confirmed by the "legislative history" set out at page 55 in Spirit of 13, Inc., Summary of Proposed Implementing Legislation and Drafters' Intent: "the state may not arbitrarily declare that it is not going to comply with Section 6 . . . if the state provides new compensating revenues."

In our view, the County's argument is unpersuasive. Even if we assume arguendo that the intent of those who drafted Proposition 4 is as claimed, what is crucial here is the intent of those who voted for the measure. (See *County of Los Angeles, supra*, 43 Cal.3d 46, 56.) There is no substantial evidence that the voters sought what the County assumes the drafters desired. Moreover, the "legislative history" cited above cannot be considered relevant; it was written and circulated after the passage of Proposition 4. As such, it could not have affected the voters in any way.

To avoid this result, the County advances one final argument: "Based on the authority of [section 17556(d)], the Commission on State Mandates refuses to hear mandates on the merits once it finds that the authority to charge fees is given by the Legislature. This position is taken whether or not fees can actually or legally be charged to recover the entire costs of the program."

The County appears to be making one or both of the following arguments: (1) the commission applies section 17556(d) in an unconstitutional manner; or (2) the Act's self-financing authority is somehow lacking. Such contentions, however, miss the designated mark. They raise questions bearing on the constitutionality of section 17556(d) as applied and the legal efficacy of the authority conferred by the Act. The sole issue on review, however, is the facial constitutionality of section 17556(d).

## III. CONCLUSION

For the reasons set forth above, we conclude that section 17556(d) is facially constitutional under article XIII B, section 6.

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Broussard, J., Panelli, J., Kennard, J., and Best (Hollis G.), J.,* concurred.

**ARABIAN, J.,** Concurring.—I concur in the determination that Government Code section 17556, subdivision (d)[1] (section 17556(d)), does not offend article XIII B, section 6, of the California Constitution (article XIII B, section 6). In my estimation, however, the constitutional measure of the issue before us warrants fuller examination than the majority allow. A literalistic analysis begs the question of whether the Legislature had the authority to act statutorily upon a subject matter the electorate has spoken to constitutionally through the initiative process.

Article XIII B, section 6, unequivocally commands that "the state shall provide a subvention of funds to reimburse . . . local government for the costs of [a new] program or increased level of service" except as specified therein. Article XIII B does not define this reference to "costs." (See Cal. Const., art. XIII B, § 8.) Rather, the Legislature assumed the task of explicating the related concept of "costs mandated by the state" when it created the Commission on State Mandates and enacted procedures intended to implement article XIII B, section 6, more effectively. (See § 17500 et seq.) As part of this statutory scheme, it exempted the state from its constitutionally imposed subvention obligation under certain enumerated circumstances. Some of these exemptions the electorate expressly contemplated in approving article XIII B, section 6 (§ 17556, subds. (a), (c), & (g); see § 17514), while others are strictly of legislative formulation and derive from

---

* Presiding Justice, Court of Appeal, Fifth Appellate District, assigned by the Chairperson of the Judicial Council.

[1] Unless otherwise indicated, all further statutory references are to the Government Code.

former Revenue and Taxation Code section 2253.2. (§ 17556, subds. (b), (d), (e), & (f).)

The majority find section 17556 valid notwithstanding the mandatory language of article XIII B, section 6, based on the circular and conclusory rationale that "the Legislature effectively—and properly—construed the term 'costs' as excluding expenses that are recoverable from sources other than taxes. In a word, such expenses are outside of the scope of the [subvention] requirement. Therefore, they need not be explicitly excepted from its reach." (Maj. opn., *ante*, at p. 488.) In my view, excluding or otherwise removing something from the purview of a law is tantamount to creating an exception thereto. When an exclusionary implication is clear from the import or effect of the statutory language, use of the word "except" should not be necessary to construe the result for what it clearly is. In this circumstance, "I would invoke the folk wisdom that if an object looks like a duck, walks like a duck and quacks like a duck, it is likely to be a duck." (*In re Deborah C.* (1981) 30 Cal.3d 125, 141 [177 Cal.Rptr. 852, 635 P.2d 446] (conc. opn. by Mosk, J.).)

Of at least equal importance, section 17500 et seq. constitutes a legislative implementation of article XIII B, section 6. As such, the overall statutory scheme must comport with the express constitutional language it was designed to effectuate as well as the implicit electoral intent. Eschewing semantics, I would squarely and forthrightly address the fundamental and substantial question of whether the Legislature could lawfully enlarge upon the scope of article XIII B, section 6, to include exceptions not originally designated in the initiative.

I do not hereby seek to undermine the majority holding but rather to set it on a firmer constitutional footing. "[S]tatutes must be given a reasonable interpretation, one which will carry out the intent of the legislators and render them valid and operative rather than defeat them. In so doing, sections of the Constitution, as well as the codes, will be harmonized where reasonably possible, in order that all may stand." (*Rose* v. *State of California* (1942) 19 Cal.2d 713, 723 [123 P.2d 505]; see also *County of Los Angeles* v. *State of California* (1987) 43 Cal.3d 46, 58 [233 Cal.Rptr. 38, 729 P.2d 202].) To this end, it is a fundamental premise of our form of government that "the Constitution of this State is not to be considered as a grant of power, but rather as a restriction upon the powers of the Legislature; and . . . it is competent for the Legislature to exercise all powers not forbidden . . . ." (*People* v. *Coleman* (1854) 4 Cal. 46, 49.) "Two important consequences flow from this fact. First, the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the

Legislature, and that body may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution. [Citations.] *In other words, 'we do not look to the Constitution to determine whether the legislature is authorized to do an act, but only to see if it is prohibited.'* [Citation.] [¶] Secondly, all intendments favor the exercise of the Legislature's plenary authority: 'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used.' [Citations.]" (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161], italics added.) "Specifically, the express enumeration of legislative powers is not an exclusion of others not named unless accompanied by negative terms. [Citations.]" (*Dean* v. *Kuchel* (1951) 37 Cal.2d 97, 100 [230 P.2d 811].)

As the majority opinion impliedly recognizes, neither the language nor the intent of article XIII B conflicts with the exercise of legislative prerogative we review today. Of paramount significance, neither section 6 nor any other provision of article XIII B prohibits statutory delineation of additional circumstances obviating reimbursement for state mandated programs. (See *Dean* v. *Kuchel, supra,* 37 Cal.2d at p. 101; *Roth Drugs, Inc.* v. *Johnson* (1936) 13 Cal.App.2d 720, 729 [57 P.2d 1022]; see also *Kehrlein* v. *City of Oakland* (1981) 116 Cal.App.3d 332, 338 [172 Cal.Rptr. 111].)

Furthermore, the initiative was "[b]illed as a flexible way to provide discipline in government spending" by creating appropriations limits to restrict the amount of such expenditures. (*County of Placer* v. *Corin* (1980) 113 Cal.App.3d 443, 447 [170 Cal.Rptr. 232]; see Cal. Const., art. XIII B, § 1.) By their nature, user fees do not affect the equation of local government spending: While they facilitate implementation of newly mandated state programs or increased levels of service, they are excluded from the "appropriations subject to limitations" calculation and its attendant budgetary constraints. (See Cal. Const., art. XIII B, § 8; see also *City Council* v. *South* (1983) 146 Cal.App.3d 320, 334 [194 Cal.Rptr. 110]; *County of Placer* v. *Corin, supra,* 113 Cal.App.3d at pp. 448-449; Cal. Const., art. XIII B, § 3, subd. (b); cf. *Russ Bldg. Partnership* v. *City and County of San Francisco* (1987) 199 Cal.App.3d 1496, 1505 [246 Cal.Rptr. 21] [" 'fees not exceeding the reasonable cost of providing the service or regulatory activity for which the fee is charged and which are not levied for general revenue purposes, have been considered outside the realm of "special taxes" [limited by California Constitution, article XIII A]' "]; *Terminal Plaza Corp.* v. *City*

*and County of San Francisco* (1986) 177 Cal.App.3d 892, 906 [223 Cal.Rptr. 379] [same].)

This conclusion fully accommodates the intent of the voters in adopting article XIII B, as reflected in the ballot materials accompanying the proposition. (See *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281].) In general, these materials convey that "[t]he goals of article XIII B, of which section 6 is a part, were to protect residents from excessive taxation and government spending." (*County of Los Angeles* v. *State of California, supra,* 43 Cal.3d at p. 61; *Huntington Park Redevelopment Agency* v. *Martin* (1985) 38 Cal.3d 100, 109-110 [211 Cal.Rptr. 133, 695 P.2d 220].) To the extent user fees are not borne by the general public or applied to the general revenues, they do not bear upon this purpose. Moreover, by imputation, voter approval contemplated the continued imposition of reasonable user fees outside the scope of article XIII B. (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Limitation of Government Appropriations, Special Statewide Elec. (Nov. 6, 1979), arguments in favor of and against Prop. 4, p. 18 [initiative "WILL curb excessive user fees imposed by local government" but "will NOT eliminate user fees . . ."]; see *County of Placer* v. *Corin, supra,* 113 Cal.App.3d at p. 452.)

"The concern which prompted the inclusion of section 6 in article XIII B was the perceived attempt by the state to enact legislation or adopt administrative orders creating programs to be administered by local agencies, thereby transferring to those agencies the fiscal responsibility for providing services which the state believed should be extended to the public." (*County of Los Angeles* v. *State of California, supra,* 43 Cal.3d at p. 56; see *City of Sacramento* v. *State of California* (1990) 50 Cal.3d 51, 66 [266 Cal.Rptr. 139, 785 P.2d 522].) "Section 6 had the additional purpose of precluding a shift of financial responsibility for carrying out governmental functions from the state to local agencies which had had their taxing powers restricted by the enactment of article XIII A in the preceding year and were ill equipped to take responsibility for any new programs." (*County of Los Angeles* v. *State of California, supra,* 43 Cal.3d at p. 61.) An exemption from reimbursement for state mandated programs for which local governments are authorized to charge offsetting user fees does not frustrate or compromise these goals or otherwise disturb the balance of local government financing and expenditure.[2] (See *County of Placer* v. *Corin, supra,* 113

---

[2] This conclusion also accords with the traditional and historical role of user fees in promoting the multifarious functions of local government by imposing on those receiving a service the cost of providing it. (Cf. *County of Placer* v. *Corin, supra,* 113 Cal.App.3d at p. 454 ["Special assessments, being levied only for improvements that benefit particular parcels of

Cal.App.3d at p. 452, fn. 7.) Article XIII B, section 8, subdivision (c), specifically includes regulatory licenses, user charges, and user fees in the appropriations limitation equation only "to the extent that those proceeds exceed the costs reasonably borne by [the governmental] entity in providing the regulation, product, or service . . . ."

The self-executing nature of article XIII B does not alter this analysis. "It has been uniformly held that the legislature has the power to enact statutes providing for reasonable regulation and control of rights granted under constitutional provisions. [Citations.]" (*Chesney* v. *Byram* (1940) 15 Cal.2d 460, 465 [101 P.2d 1106].) " ' "Legislation may be desirable, by way of providing convenient remedies for the protection of the right secured, or of regulating the claim of the right so that its exact limits may be known and understood; but all such legislation must be subordinate to the constitutional provision, and in furtherance of its purpose, and must not in any particular attempt to narrow or embarrass it." [Citations.]' " (*Id.*, at pp. 463-464; see also *County of Contra Costa* v. *State of California* (1986) 177 Cal.App.3d 62, 75 [222 Cal.Rptr. 750].) Section 17556(d) is not "merely [a] transparent attempt[] to do indirectly that which cannot lawfully be done directly." (*Carmel Valley Fire Protection Dist.* v. *State of California* (1987) 190 Cal.App.3d 521, 541 [234 Cal.Rptr. 795].) On the contrary, it creates no conflict with the constitutional directive it subserves. Hence, rather than pursue an interpretive expedient, this court should expressly declare that it operates as a valid legislative implementation thereof.

"[Initiative] provisions of the Constitution and of charters and statutes should, as a general rule, be liberally construed in favor of the reserved power. [Citations.] As opposed to that principle, however, 'in examining and ascertaining the intention of the people with respect to the scope and nature of those . . . powers, it is proper and important to consider what the consequences of applying it to a particular act of legislation would be, and if upon such consideration it be found that by so applying it the inevitable effect would be greatly to impair or wholly destroy the efficacy of some other governmental power, the practical application of which is essential and, perhaps, . . . indispensable, to the convenience, comfort, and well-being of the inhabitants of certain legally established districts or subdivisions of the state or of the whole state, then in such case the courts may and should assume that the people intended no such result to flow from the application of those powers and that they do not so apply.' [Citation.]" (*Hunt* v. *Mayor & Council of Riverside* (1948) 31 Cal.2d 619, 628-629 [191 P.2d 426].)

---

land, and not to raise general revenues, are simply not the type of exaction that can be used as a mechanism for circumventing these tax relief provisions. [Citation.]"].)

This court is not infrequently called upon to resolve the tension of apparent or actual conflicts in the express will of the people.[3] Whether that expression emanates directly from the ballot or indirectly through legislative implementation, each deserves our fullest estimation and effectuation. Given the historical and abiding role of government by initiative, I decline to circumvent that responsibility and accept uncritically the Legislature's self-validating statutory scheme as the basis for approving the exercise of its prerogative. It is not enough to say a broader constitutional analysis yields the same result and therefore is unnecessary. We provide a higher quality of justice harmonizing rather than ignoring the divers voices of the people, for such is the nature of our office.

---

[3] See, e.g., *Zumwalt* v. *Superior Court* (1989) 49 Cal.3d 167 [260 Cal.Rptr. 545, 776 P.2d 247]; *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197 [182 Cal.Rptr. 324, 643 P.2d 941]; *California Housing Finance Agency* v. *Patitucci* (1978) 22 Cal.3d 171 [148 Cal.Rptr. 875, 583 P.2d 729]; *California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575 [131 Cal.Rptr. 361, 551 P.2d 1193]; *Blotter* v. *Farrell* (1954) 42 Cal.2d 804 [270 P.2d 481]; *Dean* v. *Kuchel, supra,* 37 Cal.2d 97; *Hunt* v. *Mayor & Council of Riverside, supra,* 31 Cal.2d 619.