[No. H014099. Sixth Dist. June 3, 1996.]

CITY OF SAN JOSE, Plaintiff and Respondent, v.
THE STATE OF CALIFORNIA, Defendant and Appellant;
KATHLEEN CONNELL, as Controller, etc., et al., Real Parties in Interest
and Appellants.

## COUNSEL

Daniel E. Lungren, Attorney General, Floyd D. Shimomura, Assistant Attorney General, Linda A. Cabatic and Keith Yamanaka, Deputy Attorneys General, Gary D. Hori and Paula A. Higashi for Defendant and Appellant and for Real Parties in Interest and Appellants.

Joan R. Gallo, City Attorney, George Rios, Assistant City Attorney, David J. Stock and Joseph DiCiuccio, Deputy City Attorneys, for Plaintiff and Respondent.

Burke, Williams & Sorensen, J. Robert Flandrick, Deanna L. Ballesteros and Timothy L. Davis as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**BAMATTRE-MANOUKIAN, J.**—In 1979 the voters of the State of California (State) adopted an initiative which added article XIII B to the state Constitution. This followed in the wake of Proposition 13, which had added article XIII A the previous year. Section 6 of article XIII B imposed limits on the State's authority to mandate new programs or increased services on local governmental entities, whose taxing powers had been severely restricted by Proposition 13.[1] Under section 6, whenever the state mandated such a program, the State would be required to reimburse the local entity for the costs of the program.

The present proceeding arose after the Legislature enacted Government Code section 29550 in 1990 (hereafter, section 29550). Section 29550 authorized counties to charge cities, and other local entities such as school districts, for the costs of booking into county jails persons who had been arrested by employees of the cities and other entities. The City of San Jose (City) claims that at the time of trial it had incurred expenses of over $10 million as a result of costs imposed pursuant to section 29550.

City contends section 29550 is a state mandated program under article XIII B, section 6, and that the State must reimburse these costs. The State claims that section 29550 simply authorizes allocation of booking costs, which formerly were borne solely by the counties, among all the local entities responsible for the arrests; since there is no mandated shifting of costs from state to local government, section 29550 does not come within section 6 and no reimbursement is necessary.

We agree with the state and we therefore reverse the judgment of the superior court which had granted City's petition for a writ of mandate. We direct that the court issue an order denying the petition and enter judgment for the State.

*Background*

Articles XIII A and XIII B of the Constitution were intended to be complementary provisions with the general purpose of protecting taxpayers by restricting government's power both to levy and to spend taxes for public purposes. (*County of Fresno* v. *State of California* (1991) 53 Cal.3d 482, 486-487 [280 Cal.Rptr. 92, 808 P.2d 235]; *City of Sacramento* v. *State of California* (1990) 50 Cal.3d 51, 59, fn. 1 [266 Cal.Rptr. 139, 785 P.2d 522].)

---

[1]We will refer herein to section 6 of article XIII B of the California Constitution simply as section 6.

In 1978 article XIII A was added to the California Constitution through the adoption of Proposition 13, an initiative measure aimed at controlling ad valorem property taxes and the imposition of new "special taxes." (*County of Fresno* v. *State of California, supra,* 53 Cal.3d at p. 486.) In recognition of the fact that Proposition 13 would radically reduce county revenues, the State took steps to assume responsibility for programs previously financed by local government. (*County of Los Angeles* v. *State of California* (1987) 43 Cal.3d 46, 61 [233 Cal.Rptr. 38, 729 P.2d 202].)

The following year, through another statewide election in 1979, article XIII B was added to the Constitution. Article XIII B placed limitations on the ability of both state and local governments to appropriate funds for expenditures, effectively freezing appropriations at both the state and local level. (Cal. Const., art. XIII B, § 8, subd. (h); *id.,* § 2.) Further, section 6 was included in article XIII B in order to protect shrinking tax revenues of local government from state mandates which would require expenditure of such revenues. (*County of Fresno* v. *State of California, supra,* 53 Cal.3d at p. 487.) "[It] was intended to preclude the state from shifting financial responsibility for carrying out governmental functions onto local entities that were ill equipped to handle the task." (*Ibid.*)

Section 6 provides: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service . . . ."

In order to implement section 6, the Legislature enacted Government Code sections 17500-17630. Those sections set forth a procedure for determining whether a particular statute imposes state-mandated costs on a local entity within the meaning of section 6. Section 17525 created the Commission on State Mandates (Commission), which has the sole purpose of hearing and deciding on claims by local government that the local entity "is entitled to be reimbursed by the state for costs" as required by section 6. (Gov. Code, § 17551, subd. (a).)

A local entity seeking reimbursement must first file a claim with the Commission. The Commission then holds a public hearing, takes evidence and decides whether the particular state enactment mandates a "new program or increased level of service." (Gov. Code, §§ 17551, 17553, 17556.) The first claim made with respect to a particular statute becomes a "test claim" and its adjudication then governs all subsequent claims based on the same statute. (Gov. Code, § 17521; *Kinlaw* v. *State of California* (1991) 54 Cal.3d

326, 332 [285 Cal.Rptr. 66, 814 P.2d 1308].) If the claim is rejected, the local entity may bring an action in administrative mandamus in superior court to challenge the Commission's determination. (Gov. Code, § 17559.)

Section 29550 was enacted in 1990, effective as of July 1 of that year. It states in relevant part: "Notwithstanding any other provision of law, a county may impose a fee upon a city, [or other local entity], for reimbursement of county expenses incurred with respect to the booking or other processing of persons arrested by an employee of that city, . . . where the arrested persons are brought to the county jail for booking or detention. The fee imposed by a county pursuant to this section shall not exceed the actual administrative costs, including applicable overhead costs . . . ."

In response to the passage of section 29550, the County of Santa Clara enacted Ordinance No. NS-300.470. It provides that "(a) There is hereby imposed a fee upon every city [or other local entity], equal to the administrative costs, including applicable overhead costs of booking or other processing at any county jail facility of every person arrested by an employee of such city . . . and brought to such county jail facility for booking or detention." The ordinance further provides that "(c) [s]uch fee shall apply to every booking or processing of a person at a county jail facility on and after July 1, 1990."

In October of 1991, City, joined by the Cities of Santa Cruz and Emeryville, filed a test claim with the Commission, claiming that section 29550 imposed on City "costs mandated by the state" (Gov. Code, § 17551, subd. (a)), which were reimbursable under section 6. City alleged it had incurred costs in excess of $3 million for the first year following the effective date of Ordinance NS-300.470.

The gist of the argument in City's test claim was that counties function as political subdivisions and agents of the State, charged with enforcement of the state's criminal laws. Detaining and booking arrestees is an integral part of this law enforcement process. By authorizing counties to require cities to bear these costs, section 29550 mandated a shift of fiscal responsibility onto local entities, in violation of the purposes underlying section 6.

The Commission heard the matter on May 28, 1992, and issued a proposed statement of decision in which it concluded that section 29550 does not create a reimbursable state-mandated program within the meaning of section 6. The Commission found that "maintenance of jails and detention of prisoners have always been a local matter charged to local government, and that financial and administrative responsibility for the county jail facility are

borne by the county." The Commission further found that "the state and counties are not synonymous entities for the maintenance of the jails and detention of prisoners. . . . [¶] In sum, cities and counties are both forms of local government." Therefore, "the imposition of costs authorized by Government Code section 29550 results in a shift or reallocation of funds between local governmental entities that benefit from the county jail facility. . . . [¶] . . . [T]he reimbursement required by article XIII B of the California Constitution does not apply in this situation because that provision is concerned with the relationship between state and local governments; it does not address legislation that affects financial relationships among local governments."

Furthermore, the Commission found that section 29550 was not a state-mandated program because "the section is clearly discretionary in empowering a county to impose a booking or other processing fee upon a city . . . . Government Code section 29550 does not require, but merely authorizes, counties to establish booking fees. Each county elects whether to charge cities and other entities for booking and detention services provided at a county jail." The Commission's proposed statement of decision was unanimously adopted by the Commission as its decision on July 23, 1992.

On September 7, 1993, City filed a petition for a writ of mandate in superior court. The petition alleged that in denying City's claim the Commission misinterpreted the Constitution and section 29550 as well as various decisions of California courts. City asked 1) that the Commission's decision be vacated, 2) that the court find that section 29550 mandated a new program for which the State was obligated to reimburse City under section 6, and 3) that the State be ordered to reimburse City for all booking and processing fees incurred to date.

City named both the state and the Commission as respondents and included the state Controller, the Department of Finance and the Director of Finance as real parties in interest. The matter was fully briefed and, following a hearing on October 28, 1993, the court took it under submission.

On November 23, 1993, the superior court issued a decision in which it found that "shifting of the costs of booking and processing arrestees from counties to cities is a new program which is state mandated as opined by the legislative counsel. To hold otherwise is to deny reality and to ignore the substance of the law and follow only the form. The county is the agent of the state and is responsible for administering the state's criminal justice system." Judgment was entered for the City on May 4, 1994, and a peremptory writ of mandate issued granting City the relief requested.

The State and the Commission have appealed. We granted permission to a number of other California cities to file an amicus curiae brief in support of City.

### Standard of Review

■ Government Code section 17559 governs the proceeding below and requires that the trial court review the decision of the Commission under the substantial evidence standard. Where the substantial evidence test is applied by the trial court, we are generally confined to inquiring whether substantial evidence supports the court's findings and judgment. (*County of Los Angeles* v. *Commission on State Mandates* (1995) 32 Cal.App.4th 805, 814 [38 Cal.Rptr.2d 304].) However, we independently review the superior court's legal conclusions about the meaning and effect of constitutional and statutory provisions. (*Greenwood Addition Homeowners Assn.* v. *City of San Marino* (1993) 14 Cal.App.4th 1360, 1367 [18 Cal.Rptr.2d 350].) Here the question whether section 29550 is a state-mandated program within the meaning of section 6 is a purely legal question, warranting de novo review.

■ In interpreting a legislative enactment with respect to a provision of the California Constitution, we bear in mind the following fundamental principles: " 'Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. [Citations.] Two important consequences flow from this fact. First, the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly, or by necessary implication denied to it by the Constitution. [Citations.] . . . [¶] Secondly, all intendments favor the exercise of the Legislature's plenary authority: "If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used." [Citations.]' " (*Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168, 180 [172 Cal.Rptr. 487, 624 P.2d 1215], quoting *Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161], italics omitted.)

### Discussion

We must determine whether section 29550 constitutes a "new program or higher level of service" which is "mandated" by the State on local government within the meaning intended by section 6 of the Constitution.

■ As to the first part of the question, whether section 29550 establishes a new program or higher level of service, the leading case of *Lucia Mar Unified School Dist.* v. *Honig* (1988) 44 Cal.3d 830 [244 Cal.Rptr. 677, 750 P.2d 318] (*Lucia Mar*) provides a useful focus for discussion.

*Lucia Mar* involved Education Code section 59300, passed in 1981, which required local school districts to contribute part of the cost of educating district students at state schools for the severely handicapped. Prior to 1979 the school districts had been required by statute to contribute to the education of students in their districts who attended state schools. (Former Ed. Code, §§ 59021, 59121, 59221.) However, those statutes were repealed following the passage of Proposition 13 in 1978, and in 1979 the state assumed full responsibility for funding the schools. When article XIII B was added to the Constitution, effective July 1, 1980, the State had full financial responsibility for operating the state schools, and this was the status when section 59300 was enacted in 1981.

In 1984 the Lucia Mar Unified School District and other school districts filed a test claim asserting that Education Code section 59300 required them to make payments for a " 'new program or increased level of service,' " thus entitling them to reimbursement under section 6. The Commission denied the claim, finding that, although increased costs had been imposed on the district, section 59300 did not establish any " 'new program or increased level of service.' " This decision was affirmed by the superior court, which found that section 59300 did not mandate a new program or higher level of service but simply called for an " 'adjustment of costs.' " (*Lucia Mar*, *supra*, 44 Cal.3d at p. 834.) The Court of Appeal also affirmed, reasoning that a shift in the funding of an existing program is not a "new program."

The Supreme Court reversed the judgment in favor of the State. The court recognized that ". . . local entities are not entitled to reimbursement for all increased costs mandated by state law, but only those costs resulting from a new program or an increased level of service imposed upon them by the state." (*Lucia Mar*, *supra*, 44 Cal.3d at p. 835.) " 'Program,' " as used in article XIII B of the California Constitution, is "one that carries out the 'governmental function of providing services to the public, or laws which, to implement a state policy, impose unique requirements on local governments and do not apply generally to all residents and entities in the state.' " (*Lucia Mar*, *supra*, at p. 835, quoting *County of Los Angeles* v. *State of California*, *supra*, 43 Cal.3d at p. 56.) Under this definition the high court found that the contributions called for in Education Code section 59300 were used to fund a "program." This was so even though the school district was required only

to contribute funds to the state-operated schools rather than to administer the program itself.

The court found further that the program established by Education Code section 59300 was a "new program" insofar as the school district was concerned since, at the time it was enacted in 1981, school districts were not required to contribute to the education of their students at the state-operated schools. The court concluded that a shift in funding of an existing program from the state to a local entity constitutes a new program within the meaning of section 6. "The intent of the section [section 6] would plainly be violated if the state could, while retaining administrative control of programs it has supported with state tax money, simply shift the cost of the programs to local government on the theory that the shift does not violate section 6 . . . because the programs are not 'new.' Whether the shifting of costs is accomplished by compelling local governments to pay the cost of entirely new programs created by the state, or by compelling them to accept financial responsibility in whole or in part for a program which was funded entirely by the state before the advent of article XIIIB, the result seems equally violative of the fundamental purpose underlying section 6 of that article." (*Lucia Mar*, *supra*, 44 Cal.3d at p. 836, fn. omitted.)[2]

City and the amici curiae cities contend that the principles expressed in *Lucia Mar* compel the same result here. Section 29550, they argue, is a classic example of the state attempting to shift to local entities the financial responsibility for providing public services. As in *Lucia Mar*, the program is "new" as to City because City has not formerly been required to contribute financially to services provided via the booking process. And, as the *Lucia Mar* court explained, it does not matter that City itself is not required to provide the services; a shift in funding of an existing program from the State to the local level qualifies as a "new program" under section 6.

The flaw in City's reliance on *Lucia Mar* is that in our case the shift in funding is not from the State to the local entity but from county to city. In *Lucia Mar*, prior to the enactment of the statute in question, the program was funded and operated entirely by the state. Here, however, at the time section 29550 was enacted, and indeed long before that statute, the financial and administrative responsibility associated with the operation of county jails and detention of prisoners was borne entirely by the county. In the recent case of *County of Los Angeles* v. *Commission on State Mandates*, *supra*, 32

---

[2]In *Lucia Mar* the case was remanded to the Commission for a determination of the remaining issue, whether Education Code section 59300 in fact "mandated" the school districts to make the called for contributions. (*Lucia Mar*, *supra*, 44 Cal.3d at p. 836.)

Cal.App.4th 805, this distinction is the focus of the court's section 6 analysis.

In *County of Los Angeles*, the court of appeal addressed the question whether Penal Code section 987.9 was a state-mandated program for which counties were entitled to be reimbursed. That statute, enacted in 1977, provided that indigent defendants in capital cases could request funds for investigators and experts to assist in the preparation or presentation of the defense. Prior to 1990, costs of this program were reimbursed to the counties by the state by annual appropriations. In the Budget Act of 1990-1991, however, no appropriation was made and counties were obliged to absorb the costs. The County of Los Angeles filed a test claim with the Commission, arguing that the state's withdrawal of funding for section 987.9 costs constituted an unlawful shifting of financial responsibility for the program from the state to the counties, within the meaning of section 6 and in violation of the Supreme Court's holding in *Lucia Mar*.

The Court of Appeal in *County of Los Angeles* decided first that the requirements of Penal Code section 987.9 were not state mandated, but were mandated by the United States Constitution. As a separate basis for its opinion, however, the court found that the State's withdrawal of funds to reimburse section 987.9 costs was not a "new program" under section 6. The court distinguished *Lucia Mar* as follows: "In *Lucia Mar*, the handicapped school program in issue had been operated and administered by the State of California for many years. The court found primary responsibility rested with the state and that the transfer of financial responsibility from the state through state tax revenues to school districts through school district tax and assessment revenues in the school district treasuries imposed a new program on school districts. . . . [¶] In contrast, the program here has never been operated or administered by the State of California. The counties have always borne legal and financial responsibility for implementing the procedures under section 987.9. The state merely reimbursed counties for specific expenses incurred by the counties in their operation of a program for which they had a primary legal and financial responsibility. There has been no shift of costs from the state to the counties and *Lucia Mar* is, thus, inapposite." (*County of Los Angeles* v. *Commission on State Mandates*, *supra*, 32 Cal.App.4th at p. 817.)

This analysis applies equally to our case. It has long been the law in California that " ' "the expense of capture, detention and prosecution of persons charged with crime is to be borne by the county . . . ." ' " (*County of San Luis Obispo* v. *Abalone Alliance* (1986) 178 Cal.App.3d 848, 859 [223

Cal.Rptr. 846].) Government Code section 29602, which was enacted in 1947, provides that "[t]he expenses necessarily incurred in the support of persons charged with or convicted of a crime and committed to the county jail . . . and for other services in relation to criminal proceedings for which no specific compensation is prescribed by law are county charges." (See also *Washington Township Hosp. Dist.* v. *County of Alameda* (1968) 263 Cal.App.2d 272, 275 [69 Cal.Rptr. 442].) The Penal Code similarly provides that county jails are kept by the sheriffs of the counties in which they are located and that the expenses in providing for prisoners in those jails are to be paid out of the county treasury. (Pen. Code, §§ 4000, 4015.)

City acknowledges that counties have traditionally borne these expenses, but argues that they do so only in their role as agents of the State. Counties, it is argued, are political subdivisions of the State, organized for the purpose of carrying out functions of state government and advancing state policies, particularly in the area of administration of justice. (See, e.g., *Wilkinson* v. *Lund* (1929) 102 Cal.App. 767, 772 [283 P. 385]; Gov. Code, § 23002; *Marin County* v. *Superior Court* (1960) 53 Cal.2d 633, 638-639 [2 Cal.Rptr. 758, 349 P.2d 526].) For example, prosecutions take place in county courts but are brought on behalf of the people of the State of California; the state Attorney General has direct supervision over county sheriffs and district attorneys (Cal. Const., art. V, § 13, subd. (b); Gov. Code, §§ 12550, 12560.); and the state asserts substantial control over the operation of county jails. (Pen. Code, §§ 4000 et seq.; 6030 et seq.) Enforcement of the state's criminal laws is a governmental function, the expense of which the state imposes on the county as the administrative arm of the state. (See *Los Angeles Warehouse Co.* v. *Los Angeles County* (1934) 139 Cal.App. 368, 371 [33 P.2d 1058].) Thus even though the costs of operating county jails and detaining prisoners are paid from the county treasury, City argues those functions are essentially part of a state program. The imposition of those costs on cities therefore constitutes a shift from the state to local government.

This characterization of the county as an agent of the State is not supported by recent case authority, nor does it square with definitions particular to subvention analysis. In *County of Lassen* v. *State of California* (1992) 4 Cal.App.4th 1151 [6 Cal.Rptr.2d 359], a county sought indemnity from the state for costs of defending against an action by inmates of the county jail alleging inadequate conditions in the jail facility. The county alleged that the State has the ultimate responsibility for setting forth rules and standards governing the operation of jail facilities, and that county jails are used principally to incarcerate persons convicted of or charged with violations of

state law. Further, the county reasoned that "it [was] the agent of the State in enforcing the State's laws against third persons" and that as State's agent in this regard it was entitled to indemnity from its principal for expenditures or losses incurred in discharge of its authorized duties. (*Id.* at p. 1155.)

The Court of Appeal rejected this theory, squarely holding that the costs of operating county jails, including the capture, detention and prosecution of persons charged with crime are to be borne by the counties. (*County of Lassen* v. *State of California, supra,* 4 Cal.App.4th at p. 1156, citing Pen. Code, §§ 4000, 4015; Gov. Code, § 29602; see also *County of San Luis Obispo* v. *Abalone Alliance, supra,* 178 Cal.App.3d at p. 859.) Further, the court observed that the Legislature was entitled to make policy decisions in order to assist counties in bearing the financial burden of certain aspects of running jails, such as providing funding assistance for construction of new facilities; however, the Legislature had not decided to subsidize the operation of existing facilities or costs associated with their operation. Unless the Legislature otherwise provides, counties are required to bear costs associated with operating county jails. (Gov. Code, § 29602.)

City points out that *Lassen* is not directly relevant for our purposes because the court in that case specifically declined to comment on the question whether costs would be reimbursable under section 6. Apparently that theory of recovery had not been pursued below. (*County of Lassen* v. *State of California, supra,* 4 Cal.App. 4th at p. 1157.) *Lassen* nonetheless supports State's position that fiscal responsibility for the program in question here rests with the county and not with the State.

More importantly, in analyzing a question involving reimbursement under section 6, the definitions contained in California Constitution, article XIII B and in the legislation enacted to implement it must be deemed controlling. Article XIII B treats cities and counties alike as "local government." Under section 8, subdivision (d), this term means "any city, county, city and county, school district, special district, authority or other political subdivision of or within the state." Furthermore, Government Code section 17514 defines "costs mandated by the state" to mean any increased costs that a "local agency" or school district is required to incur. "Local agency" means "any city, county, special district, authority, or other political subdivision of the state." (Gov. Code, § 17518.) Thus for purposes of subvention analysis, it is clear that counties and cities were intended to be treated alike as part of "local government"; both are considered local agencies or political subdivisions of the State. Nothing in article XIII B prohibits the shifting of costs between local governmental entities.

■ Furthermore, we do not believe that the shifting of costs here was a state "mandate," within the meaning of section 6. As the Commission observed, "[t]he pertinent words of the statute state that '. . . a county *may* impose a fee on a city . . . .' " Thus section 29550 does not require that counties impose fees on other local entities, but only authorizes them to do so. City claims this is too literal an interpretation of the statutory language. If we take a closer look at the circumstances surrounding the enacting of section 29550, City argues, it becomes clear that it was designed to accomplish indirectly the exact result section 6 was intended to prevent.

Section 29550 was added by section 1 of Senate Bill No. 2557. Section 2 of Senate Bill No. 2557 amended Government Code section 77200 to reduce county revenues by reducing the block grants for trial court funding by approximately 10 percent. (Stats. 1990, ch. 466, pp. 2041-2042.) Moreover, Senate Bill No. No. 2557 was part of the overall state "budget package" of 1990-1991, which contained other shortfalls in county funding. In light of these budget cuts in other areas, City argues, the counties basically had no choice but to pass along booking costs as authorized by section 29550. Moreover, as to City the costs incurred are mandated because Ordinance No. NS-300.470, which is authorized by section 29550, is mandatory.

In support of its position, City submitted excerpts from the county board of supervisors meeting where Ordinance No. NS-300.470 was adopted. These excerpts reflect the generally held belief on the part of the Board members that section 29550 was passed to enable counties to make up for state revenue cuts in other programs.

We appreciate that as a practical result of the authorization under section 29550, City is required to bear costs it did not formerly bear. We cannot, however, read a mandate into language which is plainly discretionary. Nor are we persuaded by the argument that budget cuts in other programs trigger the subvention requirement in section 6. Funding decisions are policy choices. (*County of Lassen* v. *State of California, supra,* 4 Cal.App.4th at p. 1157.) Section 6 was not intended to entitle local entities to reimbursement for *all* increased costs resulting from legislative enactments, but only those costs mandated by a new program or an increased level of service imposed upon them by the State. (*Lucia Mar, supra,* 44 Cal.3d at p. 835.) Section 6 cannot be interpreted to apply to general legislation which has an incidental impact on local agency costs. (*County of Los Angeles* v. *State of California, supra,* 43 Cal.3d at p. 57.)

■ A strict construction of section 6 is in keeping with rules of constitutional interpretation, which require that constitutional limitations and restrictions on legislative power " ' "are to be construed strictly, and are not to

be extended to include matters not covered by the language used." ' "
(*Pacific Legal Foundation* v. *Brown, supra,* 29 Cal.3d at p. 180; see also
*California Teacher's Association* v. *Hayes* (1992) 5 Cal.App.4th 1513, 1529
[7 Cal.Rptr.2d 699] ["Under our form of government, policymaking author-
ity is vested in the Legislature and neither arguments as to the wisdom of an
enactment nor questions as to the motivation of the Legislature can serve to
invalidate particular legislation."].) Under these principles, there is no basis
for applying section 6 as an equitable remedy to cure the perceived unfair-
ness resulting from political decisions on funding priorities.

■ One final point merits brief comment. City contends that the Legis-
lative Counsel's determination that section 29550 imposed a state-mandated
local program is deserving of some deference. Government Code section
17575 requires the Legislature's Counsel to determine whether a proposed
bill mandates a new program or higher level of service pursuant to section 6.
Here Legislative Counsel found "[t]his bill would impose a state-mandated
local program by authorizing a county to impose a fee upon other local
agencies . . . for county costs incurred in processing or booking persons
arrested by employees of other local agencies . . . and brought to county
facilities for booking or detention." (Legis. Counsel's Dig., Sen. Bill No.
2557, 5 Stats. 1990 (Reg. Sess.) Summary Dig., pp. 170-171.) Under Gov-
ernment Code section 17579, when Legislative Counsel makes such a
determination, the enacted statute must contain explicit language providing
that "if the Commission on State Mandates determines that this act contains
costs mandated by the state, reimbursement to local agencies and school
districts for those costs shall be made pursuant to Part 7 (commencing with
section 17500) of Division 4 of Title 2 of the Government Code. . . ."
(Stats. 1990, ch. 466, § 7, p. 2046.)

These findings and required statements are not determinative, however, of
the ultimate issue, whether the enactment constitutes a state mandate under
section 6. The legislative scheme contained in Government Code section
17500 et seq. makes clear that this issue is to be decided by the Commission.
" 'It is apparent from the comprehensive nature of this legislative scheme,
and from the Legislature's expressed intent, that the exclusive remedy for a
claimed violation of section 6 lies in these procedures. The statutes create an
administrative forum for resolution of state mandate claims, and establish[]
procedures which exist for the express purpose of avoiding multiple pro-
ceedings, judicial and administrative, addressing the same claim that a
reimbursable state mandate has been created. . . . In short, the Legislature
has created what is clearly intended to be a comprehensive and exclusive
procedure by which to implement and enforce section 6.' [Citation.] [¶] Thus

the statutory scheme contemplates that the Commission, as a quasi-judicial body, has the sole and exclusive authority to adjudicate whether a state mandate exists. Thus, any legislative findings are irrelevant to the issue of whether a state mandate exists . . . ." (*County of Los Angeles* v. *Commission on State Mandates, supra,* 32 Cal.App.4th at p. 819, quoting from *Kinlaw* v. *State of California, supra,* 54 Cal.3d at p. 333, italics omitted.)

*Disposition*

We reverse the judgment and direct that the superior court issue an order denying City's petition for a writ of mandate and enter judgment for the State. Costs on appeal are awarded to appellants.

Cottle, P. J., and Mihara, J., concurred.

A petition for a rehearing was denied July 2, 1996, and respondent's petition for review by the Supreme Court was denied September 18, 1996. Mosk, J., was of the opinion that the petition should be granted.