BILL LOCKYER Attorney General GREGORY L. GONOT Deputy Attorney General
THE HONORABLE VICTOR J. WESTMAN, COUNTY COUNSEL, COUNTY OF CONTRA COSTA, has requested an opinion on the following questions:
1. May a general law county exercise its police power authority to require an industrial facility, not seeking any entitlement from the county, to use an inherently safer system or take a specific action, such as the use of particular equipment, manufacturing or refining processes, or management procedures, in order to protect public health or safety?
2. If so, would a county subject itself to a greater risk of liability under the Tort Claims Act by having its officers exercise their discretion in requiring an industrial facility to use an inherently safer system or take a specific action?
 CONCLUSIONS
1. A general law county may exercise its police power authority to require an industrial facility, not seeking any entitlement from the county, to use an inherently safer system or take a specific action, such as the use of particular equipment, manufacturing or refining processes, or management procedures, in order to protect public health or safety.
2. A county would not subject itself to a greater risk of liability under the Tort Claims Act by having its officers exercise their discretion in requiring an industrial facility to use an inherently safer system or take a specific action.
 ANALYSIS
We are informed that a general law county has adopted an industrial safety ordinance ("ISO") which is primarily applicable to petroleum refineries and chemical manufacturing facilities located within the county. The purpose of the ISO is to prevent accidental releases of hazardous materials into the environment. To provide an added measure of safety, it has been proposed that the ISO be amended to require the refineries and facilities to make changes in their operations that are determined to be "inherently safer" by county officers based upon studies of similar facilities located throughout the country.
The two questions presented for analysis concern whether the proposed ISO amendment would be valid, and if so, would county officers, in exercising their authority under the amendment, have a greater risk of liability for injuries caused by subsequent accidental releases of hazardous materials. We conclude generally that the amendment would be valid and that the county officers would not be subject to a greater risk of liability for exercising their authority under the amended ISO.
1. Proposed Ordinance Amendment
The general authority of counties and cities to adopt local ordinances is set forth in article XI, section 7 of the Constitution:
 "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."
This constitutional authority, often referred to as the "police power," is subject to the two limitations mentioned — that the power be exercised within territorial limits and be subordinate to state law. Apart from these limitations, a county's or city's police power is as broad as the police power exercisable by the Legislature itself. (Candid Enterprises, Inc. v. Grossmont Union High School Dist. (1985)39 Cal.3d 878, 885; Birkenfeld v. City of Berkeley (1976) 17 Cal.3d 129,140; 77 Ops.Cal.Atty.Gen. 137, 138 (1994); 73 Ops.Cal.Atty.Gen. 28, 29-30 (1990); 73 Ops.Cal.Atty.Gen. 13-14 (1990).)
Of course, the exercise of the police power by the Legislature or by cities and counties is also subject to any other limitations imposed by the state or federal Constitutions. Among these limitations is the general requirement that legislation be rationally related to a legitimate governmental concern. (Metromedia, Inc. v. City of San Diego (1981) 453 U.S. 490, 515; Schad v. Mt. Ephraim (1981) 452 U.S. 61, 68.) Ordinances that are not in conflict with general laws will be upheld against constitutional challenge if they are reasonably related to promoting the health, safety, or welfare of the public and if the means adopted to accomplish such goals are reasonably appropriate to the purpose. (See Sunset Amusement Co. v. Board of Police Commissioners (1972)7 Cal.3d 64, 72; Suter v. City of Lafayette (1997) 57 Cal.App.4th 1109,1128.) In Consolidated Rock Products Co. v. City of Los Angeles (1962)57 Cal.2d 515, 522, the Supreme Court observed:
 ". . . [T]he determination of the necessity and form of such regulations, as is true with all exercises of the police power, is primarily a legislative and not a judicial function, and is to be tested in the courts not by what the judges individually or collectively may think of the wisdom or necessity of a particular regulation, but solely by the answer to the question is there any reasonable basis in fact to support the legislative determination of the regulation's wisdom and necessity? Thus in Miller v. Board of Public Works (1925) 195 Cal. 477], this court said in 195 Cal. at page 490: `The courts may differ with the legislature as to the wisdom and propriety of a particular enactment as a means of accomplishing a particular end, but as long as there are considerations of public health, safety, morals, or general welfare which the legislative body may have had in mind, which have justified the regulation, it must be assumed by the court that the legislative body had those considerations in mind and that those considerations did justify the regulation. . . . [W]hen the necessity or propriety of an enactment [is] a question upon which reasonable minds might differ, the propriety and necessity of such enactment [is] a matter of legislative determination.'"
In determining the reasonableness of an ordinance, the courts will consider the degree to which the regulated business is harmed by the regulation. In Antonello v. City of San Diego (1971) 16 Cal.App.3d 161,165-166, the court explained:
 "It is fundamental a lawful business may not be destroyed under the guise of regulation. [Citation.] On the other hand, the manner of its operation may be subject to regulation reasonably necessary to promote the public health, safety, and general welfare, even though burdensome. [Citations.]"
Accordingly, an ordinance will be upheld unless it results in undue oppression or a confiscation of property. (Harriman v. City of Beverly Hills (1969) 275 Cal.App. 918, 925; Curtis v. City of Los Angeles (1916)172 Cal. 230, 234.)
With respect to the application of the proposed ISO amendment, a determination by county officers could result in anything from a major improvement of a facility's operations to the shut-down of the facility depending upon the circumstances. We are not given any facts to determine whether application of the proposed amendment could withstand judicial scrutiny if challenged in a particular situation. However, it is clear that the county may, within the scope of its police power authority, enact an ordinance which requires the operator of an industrial facility to implement certain technical or procedural changes in order to promote greater public safety. This, of course, would be contingent upon the ordinance not being in conflict with general law, an issue to which we now turn our attention.
In keeping with the limitations imposed upon the constitutional grant of police power authority, it has been repeatedly held that where a local ordinance conflicts with general law, it is void. (Cohen v. Board of Supervisors (1985) 40 Cal.3d 277, 290; A B Cattle Co. v. City of Escondido (1987) 192 Cal.App.3d 1032, 1038.) In Sherwin-Williams Co. v. City of Los Angeles (1993) 4 Cal.4th 893, the court described a proscribed "conflict" as follows:
 "`A conflict exists if the local legislation "`duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.'"' [Citations.]
 "Local legislation is `duplicative' of general law when it is coextensive therewith. [Citation.]
 "Similarly, local legislation is `contradictory' to general law when it is inimical thereto. [Citation.]
 "Finally, local legislation enters an area that is `fully occupied' by general law when the Legislature has expressly manifested its intent to `fully occupy' the area [citations] or when it has impliedly done so. . . ." (Id., at pp. 897-898.)
In light of these governing constitutional principles, would a county ordinance that seeks to impose stricter regulation on the handling of hazardous materials at industrial facilities conflict with state law? The answer to this question requires consideration of the state statutory scheme which the ISO was intended to supplement.[1] The Hazardous Materials Release Response Plans and Inventory Act (Health Saf. Code, §§ 25500-25547.2; "Act")[2]
was enacted to protect the public health and safety and environment in connection with the handling and release or threatened release of hazardous materials. (§ 25500; County of Fresno v. State of California (1991) 53 Cal.3d 482, 485; 77 Ops.Cal.Atty.Gen. 227 (1994); 70 Ops.Cal.Atty.Gen. 146, 146-148 (1987).) Each county is responsible for implementing the Act's requirements, except that a city may assume responsibility within its own jurisdiction. (§25502, subds. (a), (b).) A county, or a city that assumes responsibility, administers the Act by designating one of its departments, offices, or other agencies as the "administering agency." (§ 25502, subd. (c).)
The Act requires any "business" that handles hazardous materials to establish and implement a "business plan" for an emergency response to a release or threatened release of hazardous materials (§25503.5, subd. (a)) and submit the plan to the local administering agency for review (§ 25505). The administering agency is required to maintain records of all business plans and prepare an "area plan" for an emergency response to an actual or threatened release of hazardous materials. (§25503, subd. (c).)
Under sections 25531-25543.3, the administering agency has a direct role in the prevention of uncontrolled releases of hazardous materials. Subdivision (a) of section25534 requires the administering agency to make a preliminary determination "whether there is a significant likelihood that the handler's use of an acutely hazardous material may pose an acutely hazardous materials accident risk." If the administering agency determines that there is such risk, "it shall require the handler to prepare and to submit an RMPP [risk management and prevention program]." (§ 25534. subd. (a)(1).) The administering agency is required to inspect each site every three years to determine whether the business is in compliance with the Act's provisions. (§25537.)
Regulations adopted to implement sections25531-25543.3 are known as the California Accidental Release Prevention Program Regulations (Cal. Code Regs., tit. 19, §§ 19:2735.1-19:2785.1). The county's ISO is intended to supplement these regulations by extending the scope of some programs and by requiring additional programs such as the implementation of "inherently safer" systems.
The ISO as amended would go beyond the Act's approval process for the safety plans and programs of covered facilities by requiring the operators of the facilities to use inherently safer systems or take specific actions. As the ISO neither duplicates nor contradicts the Act, we consider first whether the Legislature has expressly manifested its intent to "fully occupy" the area of hazardous materials management by industrial facilities or has impliedly done so.
With respect to the business and area plan requirements of the Act, section 25500 states:
 ". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 "The Legislature further finds and declares that this chapter does not occupy the whole area of regulating the inventorying of hazardous materials and the preparation of hazardous materials response plans by businesses and the Legislature does not intend to preempt any local actions, ordinances, or regulations which impose additional or more stringent requirements on businesses which handle hazardous materials. Thus, in enacting this chapter, it is not the intent of the Legislature to preempt or otherwise nullify any other statute or local ordinances containing the same or greater standards and protections."
There can be no implied preemption of an area where state law expressly allows supplementary local legislation. (Suter v. City of Lafayette, supra, 57 Cal.App.4th at p. 1121.)
With respect to the Act's requirements concerning the prevention of accidental releases of airborne hazardous substances, section25531 provides:
 "(a) The Legislature finds and declares that a significant number of chemical manufacturing and processing facilities generate, store, treat, handle, refine, process and transport hazardous materials. The Legislature further finds and declares that, because of the nature and volume of chemicals handled at these facilities, some of those operations may represent a threat to public health and safety if chemicals are accidentally released.
 "(b) The Legislature recognizes that the potential for explosions, fires, or releases of toxic chemicals into the environment exists. The protection of the public from uncontrolled releases or explosions of hazardous materials is of statewide concern.
 "(c) There is an increasing capacity to both minimize and respond to releases of toxic air contaminants and hazardous materials once they occur, and to formulate efficient plans to evacuate citizens if these discharges or releases cannot be contained. However, programs designed to prevent these accidents are the most effective way to protect the community health and safety and the environment. These programs should anticipate the circumstances that could result in their occurrence and require the taking of necessary precautionary and preemptive actions, consistent with the nature of the hazardous materials handled by the facility and the surrounding environment.
 "(d) As required by Clean Air Act amendments enacted in 1990 (P.L. 101-549), the Environmental Protection Agency has developed a program for the prevention of accidental releases of regulated substances. In developing the program, the Environmental Protection Agency thoroughly reviewed a wide variety of chemical and hazardous substances to identify substances that might pose a risk to public health or safety or to the environment in the event of an accidental release. The Environmental Protection Agency developed a program to prevent accidental releases of those substances determined to potentially pose the greatest risk of immediate harm to the public and the environment. The federal program provides no options for implementing agencies to diminish the requirements or applicability of the federal program.
 "(e) In light of this new federal program, the Legislature finds and declares that the goals of reducing regulated substances accident risks and eliminating duplication of regulatory programs can best be accomplished by implementing the federal risk management program in the state, with certain amendments that are specific to the state. Therefore, it is the intent of the Legislature that the state seek and receive delegation of the federal program for prevention of accidental releases of regulated substances established pursuant to Section 112(r) of the federal Clean Air Act ( 42 U.S.C. § 7412(r)), by implementing the federal program as promulgated by the Environmental Protection Agency, with certain amendments that are specific to the state."
Unlike section 25500, section 25531
does not specifically "open the door" to local ordinances imposing additional or more stringent requirements on businesses that handle hazardous materials. Instead, it does two things. First, it stresses the importance of preventive programs in the protection of communities. Second, it defers to federal legislation, the Clean Air Act amendments of 1990, and expresses the intent that the regulatory program developed by the federal Environmental Protection Agency be implemented in this state. By expressly deferring to federal legislation and adopting the federal approach to both hazardous waste management and the prevention of accidental releases of regulated substances, the Legislature has, in effect, adopted Congress's intent expressed in the federal legislation. Of particular significance in this regard is 42 United States Code section 7412 (r)(11):
 "Nothing in this subsection shall preclude, deny or limit any right of a State or political subdivision thereof to adopt or enforce any regulation, requirement, limitation or standard (including any procedural requirement) that is more stringent than a regulation, requirement, limitation or standard in effect under this subsection or that applies to a substance not subject to this subsection."
Hence, as a political subdivision of the state, a county is not precluded by the federal Clean Air Act from adopting and enforcing its own regulations pertaining to hazardous materials that may be released into the air. Given the Legislature's deference to federal legislation and programs, no such preclusion exists under the terms of sections25531-25543.3. The county may thus adopt ordinances providing for stricter regulation than state or federal law in the handling of hazardous materials at industrial facilities.[3]
In answer to the first question, therefore, we conclude that a general law county may exercise its police power authority to require an industrial facility, not seeking any entitlement from the county, to use an inherently safer system or take a specific action, such as the use of particular equipment, manufacturing or refining processes, or management procedures, in order to protect public health or safety.
2. County Liability
The second question presented concerns whether the county would increase its risk of liability under the Tort Claims Act (Gov. Code, §§ 810-998.3) by having its officers exercise their discretion under the proposed amended ISO in requiring an industrial facility to use an inherently safer system or take some other prescribed action. We conclude that the county would not increase its risk of liability.
For purposes of our analysis, we may assume that the ISO has been amended, county officers have required a stationary source to make changes in its operations, and the facility has had an accidental release of hazardous materials causing injuries to members of the public. The persons injured are considering whether to seek damages from the county, on the grounds that the county-mandated changes caused or worsened the accident.
The Tort Claims Act governs actions at law for civil liability against public agencies and their officers and employees. (81 Ops.Cal.Atty.Gen. 331, 332 (1998).) The statutory scheme specifically addresses "the substantive liabilities and immunities of (§§ 810-895.8), the procedures for initiating claims against (§§ 900-935.6), and the entitlement to defense of (§§ 995-996.6) and indemnification for (§§ 825-825.6) public employees." (81 Ops.Cal.Atty.Gen. 199, 199-200 (1998), fn. omitted.) A public entity is not generally liable for an injury except as otherwise provided by statute. (Gov. Code, § 815; Caldwell v. Montoya (1995)10 Cal.4th 972, 980; Iverson v. Muroc Unified School Dist. (1995)32 Cal.App.4th 218, 227.) Section 815.2 provides:
 "(a) A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.
 "(b) Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."
In determining whether liability may exist in a particular case, the threshold inquiry under the Torts Claims Act is whether the defendant owes a duty of care to the plaintiff. (Williams v. State of California (1983) 34 Cal.3d 18, 22-23; Ronald S. v. County of San Diego (1993)16 Cal.App.4th 887, 893.) "The existence of a duty `is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law. . . .' [Citation.]" (Stout v. City of Porterville (1983) 148 Cal.App.3d 937,941.) Where a duty of care is found, the next issue to be determined is whether there has been a breach of that duty. A finding of negligence rests upon a determination that the actor has failed to perform a duty of care owned to the injured party. (Ronald S. v. County of San Diego, supra, 16 Cal.App.4th at p. 893.) The breach of duty may be an affirmative act that places the person in peril or increases the risk of harm. (William v. State of California, supra, 34 Cal.3d at p. 24; McCorkle v. Los Angeles (1969) 70 Cal.3d 252.) Finally, if a duty of care is established and a breach of that duty found to cause the injury, it must be decided whether there exists a statutory immunity for the public agency and its officers and employers which precludes recovery. In Washington v. County of Contra Costa (1995) 38 Cal.App.4th 890, the court found no duty of care owed by the county under the Act's mandatory provisions to prevent releases of hazardous materials. (Id., at pp. 896-900.) Moreover, even if causation and negligence were established, the court concluded that the county and its officers and employees were immune from liability. (Ibid.) Specifically, we note that no liability could attach on the basis that the proposed amended ISO itself was faulty or ill-advised. "A public employee is not liable for an injury caused by his adoption of or failure to adopt an enactment or by his failure to enforce an enactment." (Gov. Code, § 821.) An "enactment" is defined to include ordinances. (Gov. Code, § 810.6.)
If it were alleged that the injury resulted from errors in the conception or development of specific changes which the industrial facility was required to implement, a further immunity would be provided for the county officer's exercise of discretion. Government Code section820.2 states:
 "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."
This immunity for the exercise of discretion covers deliberate and considered policy decisions in which a conscious balancing of risks and advantages takes place. (Caldwell v. Montoya, supra, 10 Cal. 413 at pp. 981-982.) While each decision by a county officer under the proposed amended ISO would focus upon a particular industrial facility's operations, the mandated changes would be based upon relevant studies conducted at similar facilities located throughout the country. Each decision would be a considered policy determination, balancing the risks and advantages, and thus would constitute a discretionary act within the meaning of Government Code section 820.2. (See Ronald S. v. County of San Diego, supra, 16 Cal.App.4th at p. 888; Taylor v. Buff (1985)172 Cal.App.3d 384, 390.)[4]
We conclude in answer to the second question that a county would not subject itself to a greater risk of liability under the Tort Claims Act by having its officers exercise their discretion in requiring an industrial facility to use an inherently safer system or take a specific action.
[1] The ISO states in part:
 "This Ordinance adds Chapter 450-8 to the County Ordinance Code. Chapter 450-8 imposes regulations which supplement the requirements of California Health and Safety Code Article 2 (commencing with section 25531) of Chapter 6.95 concerning hazardous materials management by enacting measures to prevent and reduce the probability of accidental releases of regulated substances that have the potential to cause significant harm to the public health and increase participation by industry and the public to improve accident prevention. These measures include submission of a Safety Plan to the county, stringent requirements for the contents of a Safety Plan and Safety Program, public review of the Safety Plan, authorization for the County to require changes in the Safety Plan or Safety Program, and expansion of the list of regulated substances beyond those covered by the Federal and State Risk Management Program regulations, and authorization for the County to expand audits and inspections to all units within the Stationary Sources."
[2] All references hereafter to the Health and Safety Code are by section number only.
[3] Our discussion of the proposed amended ISO's possible conflict with general laws is limited to the type of accidental releases covered by sections 25531-25543.3. The effect of the proposed amended ordinance, if any, on other statewide environmental programs is beyond the scope of this opinion.
[4] In contrast, the actual implementation of the mandated changes would be ministerial in nature, and thus not subject to this immunity. However, under the proposed amended ISO, the implementation of the mandated changes would be carried out by the facility operator, not the county.