[No. B156870. Second Dist., Div. Seven. July 28, 2003.]

COUNTY OF LOS ANGELES, Plaintiff and Respondent, v.
COMMISSION ON STATE MANDATES, Defendant and Appellant;
DEPARTMENT OF FINANCE, Real Party in Interest and Appellant.

## COUNSEL

Paul M. Starkey, Camille Shelton and Katherine Tokarski for Defendant and Appellant.

Bill Lockyer, Attorney General, Andrea Lynn Hoch, Assistant Attorney General, Louis R. Mauro, Catherine M. Van Aken, and Geoffrey L. Graybill, Deputy Attorneys General, for Real Party in Interest and Appellant.

Lloyd W. Pellman, County Counsel and Stephen R. Morris, Principal Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

MUNOZ (AURELIO), J.[*] —A 1995 amendment to Penal Code section 13519[1] requires local law enforcement officers to participate in two hours of domestic violence training. The issue on appeal is whether this amendment resulted in a reimbursable state-mandated program within the meaning of article XIII B, section 6 of the California Constitution for the time spent by local law enforcement officers in such domestic violence training, although such officers were already required to spend 24 hours in continuing education training and the domestic violence training 'could be included within this total.

This administrative mandamus proceeding was commenced by the County of Los Angeles (County) on a "test claim" filed with and denied by the

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] Hereafter section 13519.

Commission on State Mandates (Commission) for the County's costs incurred pursuant to section 13519. The trial court found that California Constitution article XIII B, section 6 required the state to reimburse the County for domestic violence training because the County's needs and priorities might be detrimentally affected when the state took away two hours of training by mandating that two specific hours of training occur. The trial court remanded the proceedings to the Commission to determine the amount of costs actually incurred by the County. We reverse.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Article XIII B, section 6 of the California Constitution provides: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service ...." (Cal. Const., art. XIII B, § 6.) The Commission is charged with hearing and deciding local agency claims of entitlement to reimbursement under article XIII B, section 6. (Gov. Code, § 17551, subd. (a).) Pursuit of such a claim is the exclusive remedy for this purpose (Gov. Code, § 17552), but the Commission's decisions are subject to review by administrative mandamus, under Code of Civil Procedure section 1094.5. (Gov. Code, § 17559, subd. (b).) A "test claim" is "the first claim, including claims joined or consolidated with the first claim, filed with the commission alleging that a particular statute or executive order imposes costs mandated by the state." (Gov. Code, § 17521; see also *Kinlaw v. State of California* (1991) 54 Cal.3d 326, 328–329, 331–333 [285 Cal.Rptr. 66, 814 P.2d 1308].)

In 1995, section 13519, subdivision (e) was amended to provide: "(e) Each law enforcement officer below the rank of supervisor who is assigned to patrol duties and would normally respond to domestic violence calls or incidents of domestic violence shall complete, every two years, an updated course of instruction on domestic violence that is developed according to the standards and guidelines developed pursuant to subdivision (d). The instruction required pursuant to this subdivision shall be funded from existing resources available for the training required pursuant to this section. It is the intent of the Legislature not to increase the annual training costs of local government."[2]

---

[2] The currently enacted version of this provision is found at section 13519, subdivision (g), and reads, "Each law enforcement officer below the rank of supervisor who is assigned to patrol duties and would normally respond to domestic violence calls or incidents of domestic violence shall complete, every two years, an updated course of instruction on domestic violence that is developed according to the standards and guidelines developed pursuant to subdivision (d). The instruction required pursuant to this subdivision shall be funded from

Penal Code section 13510,[3] et seq. requires the State Commission on Peace Officer Standards and Training (POST) to promulgate regulations establishing minimum state standards relating to physical, mental, and moral fitness, and minimum training standards for law enforcement officers. Compliance with POST's requirements is voluntary. (Pen. Code, § 13510 et seq.) POST has a certification program for peace officers specified in sections 13510 and 13522 and for the California Highway Patrol. (Pen. Code, §§ 13510.1, subds. (a)–(c), 13510.3.)

On or about December 26, 1996, the County filed a "test claim"[4] pursuant to Government Code section 17522 with the Commission.[5] The test claim alleged that neither local police officers nor their agencies were given any choice with respect to compliance with section 13519. However, in order to implement the training, the County was required to redirect its officers from their normal work in order to attend the two-hour domestic violence training. The County alleged this substitution of the work agenda of the state for that of the local government violated California Constitution article XIII B, section 6. Furthermore, the County pointed to language in Penal Code section

existing resources available for the training required pursuant to this section. It is the intent of the Legislature not to increase the annual training costs of local government entities." (Stats. 1998, ch. 701, § 1, designated the paragraph following subd. (a) as subd. (b) and redesignated the remaining subdivisions accordingly; in redesignated subd. (c), inserted par. (5), listing the signs of domestic violence as an instruction topic, and redesignated pars. (5) to (16) as pars. (6) to (17).)

[3] Penal Code section 13510, subdivision (a), provides in relevant part: "For the purpose of raising the level of competence of local law enforcement officers, [POST] shall adopt, and may from time to time amend, rules establishing minimum standards relating to physical, mental, and moral fitness that shall govern the recruitment of any city police officers, peace officer members of a county sheriff's office, marshals or deputy marshals of a municipal court, peace officer members of a county coroner's office ...."

[4] The test claim also challenged the incident-reporting requirements of Penal Code section 13730, which imposed a new program upon local law enforcement agencies to include in the domestic violence incident report additional information regarding the use of alcohol and controlled substances by the alleged abuser, and any prior domestic violence responses to the same address. The County did not contest the Commission's outcome relating to this portion of the test claim, and therefore this issue is not before us on appeal.

[5] In 1984, the Legislature created a statutory procedure for determining whether a statute imposes state-mandated costs on a local agency within the meaning of California Constitution article XIII B, section 6. (See Gov. Code, § 17500 et seq.) The local agency files a test claim with the Commission, which holds a public hearing and determines whether the statute mandates a new program or increased level of service. (Gov. Code, §§ 17521, 17551, 17555.) If the Commission finds that a claim is reimbursable, it then determines the amount of reimbursement. (Gov. Code, § 17557.) The local agency then follows statutory procedures to obtain reimbursement. (See Gov. Code, § 17558 et seq.) Where the Commission finds no reimbursable mandate, the local agency can challenge this finding by administrative mandate proceedings under Code of Civil Procedure section 1094.5. (See Gov. Code, § 17552 [these provisions "provide the sole and exclusive procedure by which a local agency ... may claim reimbursement for costs mandated by the state as required by Section 6"].)

13519, subdivision (e), providing that, "The instruction required pursuant to this subdivision shall be funded from existing resources available for the training required pursuant to this section. It is the intent of the Legislature not to increase the annual training costs of local government entities."

The test claim alleged that although POST bore the cost of producing two-hour telecourses on domestic violence, POST did not provide for any local law enforcement salary reimbursement for attendance at any type of POST-certified training, including the state-mandated costs for domestic violence training. Adherence to POST standards is voluntary by local law enforcement agencies, but POST requires a minimum of 24 hours of training every two years, to be chosen from a menu of available courses. POST does not dictate the courses that must be taken. POST courses include training in, among other things: interviewing techniques for detectives, defensive weapons, CPR, conflict resolution, bicycle patrol, ritual crime and hate group offenders, vehicle pullover and approach, confessions, courtroom demeanor, electronic vehicle recovery systems, vehicle theft investigation, and cultural awareness.

The POST program gives local law enforcement agencies flexibility in choosing training programs to meet their differing needs. In addition to domestic violence training, certain other programs are legislatively mandated: dealing with the developmentally disabled/mentally ill training (implemented July 1992); high-speed vehicle pursuits (implemented November 1994); first aid/CPR (a 21-hour initial course, with a 12-hour refresher course every three years); missing persons (implemented January 1989); racial and cultural diversity (implemented August 1983); sexual harassment (implemented November 1994); and sudden infant death syndrome (implemented July 1990). The time requirements for these other required courses vary. Some elective courses require 40 hours to complete.

However, the County alleged because there were no existing resources available for the domestic violence training, the annual training costs of the County were increased as a result of section 13519. The County Sheriff's Department incurred costs of $170,351.45 for domestic violence training for the fiscal year 1996–1997.

In support of its test claim, the County submitted legislative materials relating to section 13519. These included a July 5, 1995 memorandum in which the Assembly Committee on Appropriations stated that Senate Bill No. 132, proposing the changes to 13519, understood the "training requirement could have significant costs to local law enforcement in terms of expense and public safety, as most departments will be forced to backfill for offices while the officers are being trained or will have to forego the

backfilling and have fewer officers on patrol. Any monetary costs incurred by local law enforcement for the officer backfilling would be state-reimbursable." The Committee noted that, "Although this bill states that the costs of the additional domestic violence training be absorbed by POST within existing resources, the reality is that this bill would create additional non-absorbable costs to POST since POST will be unable to exclude one type of training in favor of the domestic violence training, and instead will have to add this training to their current curriculum. The current curriculum of POST training is just as important to the maintaining of public safety as is the additional domestic violence training."

In addition, the Department of Finance recognized the fiscal impact of section 13519 on local law enforcement agencies, and opposed the adoption of Senate Bill No. 132. Diane M. Cummins, Deputy Director of the State Department of Finance, wrote to Senator Diane Watson on April 20, 1995, that, "This bill also specifies that training required pursuant to this measure 'shall be funded from existing resources', as specified. In so specifying, this bill would also require law enforcement agencies to modify existing training programs by increasing training requirements. Finance believes this bill contains a local mandate without providing necessary funding, thereby being in conflict with the California Constitution, which requires the state to fund local mandate costs. Although there is no specific information available regarding the level of additional costs which would be imposed on law enforcement agencies, the Department of Finance is opposed to legislation which would result in additional General Fund expenditures, given the State's ongoing fiscal constraints." The Department of Finance recognized that, "Adding mandatory domestic violence training requirement would result in an additional unknown cost for specified state and local law enforcement agencies ...."

Furthermore, Gretchen Fretter, Chair of the California Academy Directors' Association (an organization of training center directors and police academy managers throughout the state) wrote Senator Watson on March 9, 1995, to express the association's concerns with Senate Bill No. 132. Fretter's analysis indicated that the mandate would incur a $300,000 price tag for each training cycle. The California State Sheriffs' Association also wrote to express concerns about Senate Bill No. 132, including that POST estimated the domestic violence training would add costs to local agencies of at least $750,000 per year. Glen Fine, the Deputy Executive Director of POST, on July 11, 1997, wrote to the Department of Finance to inform it that POST understood that the author of Senate Bill No. 132 was aware of POST's training requirements of 24 hours every two years, and it was "the author's intent ... that domestic violence update training become a statutorily required priority for inclusion within this 24 hours of training every two years."

POST issued a bulletin in February 1996 advising local law enforcement agencies of the new domestic violence training requirement.

The Department of Finance contended that the Legislature intended the domestic violence continuing education and training to be funded from existing resources. The department also contended that POST, which was charged with developing training standards for local law enforcement agencies, provided over $21 million in existing state funds for domestic violence training. POST pointed out that the drafter of the statute recognized the requirement of 24 hours of continuing education every two years, and intended the domestic violence training to be a priority to be included within this 24-hour requirement.

At the hearing before the Commission on the test claim, representatives of the County testified that POST refused to pay for the programs, putting the burdens on local governments, and POST itself had estimated the annual cost of the program at $750,000. A representative of the Sheriff's Department (Captain Dennis Wilson) testified that of the 24 hours required, any combination of courses could be used to meet the requirement. However, inclusion of the domestic violence training would take away two of those hours of training, resulting in only 22 hours. The Sheriff's Department would conduct domestic violence training even in the absence of the mandate; indeed; the Sheriff's Department actually conducted about 72 hours of training per officer per year. There was no funding for any of this training. The Sheriff's Department has 8,200 sworn officers, and two hours of training per officer adds up to 16,400 hours, which translates to 10 full-time officers for a year. Without funding for the domestic violence training, the Sheriff's Department therefore would lose the time equivalent of 10 officers for a year. Taking officers off the street impacts upon crime.

Martha Zavala testified on behalf of the County that the domestic violence training could not merely be subsumed within the 24 hours already required. With the training mandates already required by POST which exceed the 24-hour minimum, adding the domestic violence training only further exceeds the minimum 24 hours. There is no room to carve it out. Meeting POST requirements is not really an option. Thus, both the Sheriff's Department and the County agree they are seeking reimbursement of the costs of the training and the cost of replacing the officers on the street while in training.

A representative of POST testified that what POST provides in reimbursement to local law enforcement agencies is a small percentage of the real costs incurred. Where the training involved is through a telecourse, POST provides no reimbursement. There has been no increase in POST's budget since the amendment to section 13519. About 30 of the courses provided by POST are mandated training.

A representative of the Department of Finance testified that the Department believed section 13519 did not create state-mandated reimbursable program because the legislation indicated it was the Legislature's intent not increase the training costs of local government, and the training could be fit within the existing 24-hour requirements.

The Commission's staff prepared an analysis in advance of the hearing which found against the County. The "Staff Analysis" pointed out that section 13519 was originally added by chapter 1609, Statutes of 1984.[6] Originally, the statute required that POST develop and implement a basic course of instruction for the training of law enforcement officers in the handling of domestic violence complaints, with local law enforcement agencies encouraged, but not required, to provide updates. These provisions of the 1984 version were the subject of a test claim filed by the City of Pasadena in 1990. That claim was denied because the original statute did not require local agencies to implement or pay for a domestic violence training program, did not increase the minimum basic training course hours or advanced officer training hours, and did not require local agencies to provide domestic violence training pursuant to the POST skills and knowledge standards.

Legally, the Staff Analysis pointed out that in order for a statute to impose a reimbursable state-mandated program, the statutory language must (1) direct or obligate an activity or task upon local government entities, and (2) the required activity or task must be new or it must create an increased or higher level of service over the former required level of service. (See, e.g., *County of Los Angeles v. State of California* (1987) 43 Cal.3d 46, 56 [233 Cal.Rptr. 38, 729 P.2d 202].) The Staff Analysis concluded that section 13519 did impose a new activity or program upon local law enforcement agencies. However, because the language of the statute requiring that the instruction be funded from existing resources, it was an open question whether the program imposed *mandated* costs. Because POST's minimum requirements remained at 24 hours before and after enactment of section 13519, there were no increased training hours and costs associated with the domestic violence training course. Instead, the course should be accommodated or absorbed by

[6] The history of section 13519 is as follows: Added by Statutes 1984, chapter 1609, section 2, pages 5711–5713. Amended by Statutes 1985, chapter 281, section 1, pages 1305–1306, effective July 26, 1985; Statutes 1989, chapter 850, section 3; Statutes 1991, chapter 912 (Sen. Bill No. 421), section 1, pages 4086–4088, Statutes 1993, chapter 1098 (Assem. Bill No. 1268), section 8, pages 6162–6163; *Statutes 1995, chapter 965 (Sen. Bill No. 132),* section 1, pages 7377–7380; Statutes 1998, chapter 606 (Sen. Bill No.1880), section 13; Statutes 1998, chapter 701 (Assem. Bill No. 2172), section 1; Statutes 1999, chapter 659 (Sen. Bill No. 355), section 4. The 1995 amendment, at issue here, rewrote subdivision (e), which prior to amendment read: "(e) Forty thousand dollars ($40,000) is appropriated from the Peace Officers Training Fund [POST] in augmentation of Item 8120-001-268 of the Budget Act of 1984, (Stats. 1993 ch. 1098, §8, p. 6188.) to support the travel, per diem, and associated costs for convening the necessary experts."

local law enforcement agencies within their existing resources available for training. Thus, the Staff Analysis recommended denial of the test claim.

After the public hearings were held, the Commission adopted the findings of the Staff Analysis. The Commission issued its own statement of decision which substantially adopted the findings of the Staff Analysis.

Subsequently, the County filed a petition for writ of mandate with the trial court, seeking vacation of the Commission's decision. The County argued that the domestic violence training constituted a state-mandated reimbursable program because it (1) was mandatory, while the POST certification training was optional; and (2) the only way local agencies could avoid the costs of the new program would be to redirect their efforts from the training they were already providing as part of POST training, thereby losing flexibility to design programs to suit their own needs.

The Commission argued that the County's focus on "redirected" manpower costs was misplaced. Instead, the focus should be on whether the local law enforcement agencies actually experience increased expenditure of their tax revenues. (See, e.g., *County of Sonoma v. Commission on State Mandates* (2000) 84 Cal.App.4th 1264, 1283 [101 Cal.Rptr.2d 784].) In *County of Sonoma,* the court stated that California Constitution article XIII B, section 6 was designed to prevent the state from forcing programs on local governments, and such a forced program is one which results in "increased actual expenditures of limited tax proceeds that are counted against the local government's spending limit. Section 6, located within a measure aimed at limiting expenditures, is expressly concerned with 'costs' incurred by local governments as a result of state-mandated programs, particularly when the costs of compliance with a new program restrict local spending in other areas." (*County of Sonoma,* at p. 1284.) Because section 13519 did not require the County to incur "actual increased costs" because the domestic violence training could be subsumed within the 24-hour POST training requirement, no state reimbursement was required.

The Commission also argued the state had not required the County to incur increased training costs for salaries of officers to receive the two-hour training. POST's requirements did not change as a result of section 13519, and indeed, shortly after the enactment of section 13519, POST forwarded a bulletin to local law enforcement agencies suggesting they include domestic violence training within the 24-hour continuing training requirement.

The trial court heard argument, after which the trial court adopted its tentative statement of decision in which it noted that, "Although it may be reasonable in some or even most cases for a deputy to eliminate an unrequired two-hour elective in favor of the required domestic violence instruction, what about cases where the County's needs and priorities would be affected detrimentally, if two hours of electives were taken away? At what point would additional mandated courses result in increased costs? [¶] The record also shows that, for some deputies, other state-required training already amounts to 24 hours or more per two-year period. For these deputies, the two hours of mandated domestic violence training cannot be accommodated by giving up other training but must be added on, for added cost. It appears that, if domestic violence instruction is to be funded from existing resources on a deputy-by-deputy basis, the County clearly does incur increased costs." The trial court granted the petition, and remanded the matter for consideration of the exact amount of increased costs.

## DISCUSSION

### I. *STANDARD OF REVIEW.*

■ The determination whether the statute here at issue established a mandate under California Constitution article XIII B, section 6, is a question of law. (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 109 [61 Cal.Rptr.2d 134, 931 P.2d 312].) Under Government Code section 17559,[7] administrative mandamus is the exclusive means to challenge a decision of the Commission on a subvention claim. (*Redevelopment Agency v. Commission on State Mandates* (1997) 55 Cal.App.4th 976, 980 [64 Cal.Rptr.2d 270].) "Government Code section 17559 governs the proceeding below and requires that the trial court review the decision of the Commission under the substantial evidence standard. Where the substantial evidence test is applied by the trial court, we are generally confined to inquiring whether substantial evidence supports the court's findings and judgment. [Citation.] However, we independently review the superior court's legal conclusions about the meaning and effect of constitutional and statutory provisions. [Citation. ]" (*City of San Jose v. State of California* (1996) 45 Cal.App.4th 1802, 1810 [53 Cal.Rptr.2d 521].)

---

[7] Government Code section 17559, subdivision (b), provides: "A claimant or the state may commence a proceeding in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure to set aside a decision of the commission on the ground that the commission's decision is not supported by substantial evidence. The court may order the commission to hold another hearing regarding the claim and may direct the commission on what basis the claim is to receive a rehearing."

## II. SECTION 13519'S IMPOSITION OF A DOMESTIC VIOLENCE TRAINING COURT IS NOT A STATE-MANDATED PROGRAM WITHIN THE MEANING OF CONSTITUTION ARTICLE XIII B, SECTION 6 BECAUSE IT DOES NOT CONSTITUTE AN "INCREASED LEVEL OF SERVICE."

The Commission essentially makes two arguments. First, it contends that the County did not incur "increased costs." Reimbursement to the County under California Constitution article XIII B, section 6 is not required unless there is a showing of actual increased costs mandated by the state. (See, e.g., *County of Los Angeles v. State of California, supra,* 43 Cal.3d at pp. 54–55; *City of Sacramento v. State of California* (1990) 50 Cal.3d 51, 66–67 [266 Cal.Rptr. 139, 785 P.2d 522].) In *City of Sacramento,* the court explained that the statutory concept of "costs mandated by the state" and the constitutional concept of article XIII B, section 6, are identical. (*City of Sacramento v. State of California, supra,* 50 Cal.3d at p. 67, fn. 11.) Because of this limited, rather than broad definition, of "costs mandated by the state," article XIII B, section 6 does not provide reimbursement for every single increased cost. Thus, the trial court's finding that reimbursement was required where a statute results in a "redirection of local effort" or a "detrimental change in a local agency's needs and priorities" is not supported by the law. Rather, it constitutes an inappropriate injection of an equitable standard into the analysis.

Secondly, the Commission argues that no "mandate" exists. To the contrary, substantial evidence supports its finding that section 13519 does not result in *increased* costs because nothing in the statute requires the County, or any other local law enforcement agency, to incur actual increased costs. The total number of hours required (the 24 minimum hours of POST training) did not increase because of the domestic violence training; rather, POST still requires 24 hours and in fact after the passage of section 13519, POST forwarded a bulletin to law enforcement agencies recommending that they include domestic violence training within the 24-hour continuing professional training requirement. Because the POST standards are voluntary, if a local law enforcement agencies adds two hours of domestic violence training to either the POST requirement or its own requirements, it is doing so at its own discretion.

In response, the County points out that the Commission's conclusion is based upon the erroneous premise that local law enforcement agencies could escape increased costs simply by dropping two hours of their existing POST training and substituting the new domestic violence training. However, the evidence in the legislative history indicates that this was not the intent of the Legislature when it was considering section 13519, nor was it the position of

the Department of Finance. The County also contends that local law enforcement agencies incur costs when they sacrifice their existing training programs for the new domestic violence training. Although POST does not dictate those courses for which a local law enforcement agency must offer training and POST does pay for much of the training material, most of the cost of POST training is borne by the local law enforcement agencies in the form of personnel costs while deputies spend 24 hours of work time receiving training. Furthermore, if a mere legislative directive to fund a new program with existing resources would let the state off the hook for reimbursement, then the constitutional rule of mandate reimbursement would be a nullity: any new state mandate can be funded by canceling other services. Because California Constitution article XIII B, section 6 was designed to prevent the elimination of the fiscal freedom of local governmental agencies to expend their limited available resources without being straightjacketed by state-mandated programs, the Commission's "within existing resources" rule would circumvent the purposes of article XIII B, section 6.

### The Purposes of California Constitution Article XIII B, Section 6 Guide Our Analysis.

In 1978, the voters approved Proposition 13, which added article XIII A to the California Constitution. Article XIII A "imposes a limit on the power of state and local governments to adopt and levy taxes. [Citation.]" (*County of Fresno v. State of California* (1991) 53 Cal.3d 482, 486 [280 Cal.Rptr. 92, 808 P.2d 235].) In 1979, Proposition 4 added article XIII B to the Constitution, which imposed a complementary limit on governmental spending. (*San Francisco Taxpayers Assn. v. Board of Supervisors* (1992) 2 Cal.4th 571, 574 [7 Cal.Rptr.2d 245, 828 P.2d 147].) These two constitutional provisions "work in tandem, together restricting California government's power both to levy and to spend for public purposes." (*City of Sacramento v. State of California, supra,* 50 Cal.3d at p. 59, fn. 1.) Their goal is to protect citizens from excessive taxation and government spending. (*County of Los Angeles v. State of California, supra,* 43 Cal.3d at p. 61.)

California Constitution article XIII B, section 6, provides in relevant part: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service." Article XIII B, section 6, prevents the state from shifting financial responsibility for carrying out governmental functions to local agencies, which are "ill equipped" to assume increased financial responsibilities because of the taxing and spending limitations of articles XIII A and XIII B. (*County of Fresno v. State of California, supra,* 53 Cal.3d at p. 487.) Section 6 thus requires the state "to pay for any new

governmental programs, or for higher levels of service under existing programs, that it imposes upon local governmental agencies. [Citation.]" (*Hayes v. Commission on State Mandates* (1992) 11 Cal.App.4th 1564, 1577 [15 Cal.Rptr.2d 547].)

■ State mandate jurisprudence has established that in general, local agencies are not entitled to reimbursement of all increased costs mandated by state law, but only those resulting from a "new" program or an "increased level of service" imposed upon them by the state. (*Lucia Mar Unified School District v. Honig* (1988) 44 Cal.3d 830, 835 [244 Cal.Rptr. 677, 750 P.2d 318].) A "program" is defined as a program which carries out the "governmental function of providing services to the public, or laws which, to implement a state policy, impose unique requirements on local governments and do not apply generally to all residents and entities in the state." (*County of Los Angeles v. State of California, supra,* 43 Cal.3d at p. 56.) A program is "new" if the local governmental entity had not previously been required to institute it. (*City of San Jose v. State of California, supra,* 45 Cal.App.4th at p. 1812.) State mandates are requirements imposed on local governments by legislation or executive orders. (*County of Los Angeles v. State of California, supra,* 43 Cal.3d at p. 50.) Since the purpose of California Constitution article XIII B, section 6 is to avoid governmental programs from being forced on localities by the state, programs which are not unique to the government do not qualify; the programs must involve the provision of governmental services. (*City of Sacramento v. State of California, supra,* 50 Cal.3d at p. 68.) Further, in order for a state mandate to be found, the local governmental entity must be required to expend the proceeds of its tax revenues. (*Redevelopment Agency of the City of San Marcos v. Commission on State Mandates, supra,* 55 Cal.App.4th at p. 986.) Lastly, there must be compulsion to expend revenue. (*County of Merced v. State of California* (1984) 153 Cal.App.3d 777, 780, 783 [200 Cal.Rptr. 642] [revisions to Code of Civil Procedure required entities exercising the power of eminent domain to compensate businesses for lost goodwill did not create state mandate, because the power of eminent domain was discretionary, and need not be exercised at all]; *Department of Finance v. Commission on State Mandates* (2003) 30 Cal.4th 727 [134 Cal.Rptr.2d 237, 68 P.3d 1203].) In *Lucia Mar,* the court explained article XIII B, section 6. "The intent of the section would plainly be violated if the state could, while retaining administrative control of programs it has supported with state tax money, simply shift the cost of the programs to local government on the theory that the shift does not violate section 6 of article XIIIB because the programs are not 'new.' " (*Lucia Mar Unified School District v. Honig, supra,* 44 Cal.3d at p. 836.)

However, in spite of all of the above, "increased level of service" is not defined in California Constitution article XIII B, section 6 or in the ballot materials. (*Long Beach Unified School District v. State of California* (1990)

225 Cal.App.3d 155, 173 [275 Cal.Rptr. 449].) Furthermore, "Although a law is addressed only to local governments and imposes new costs on them, it may still not be a reimbursable state mandate." (*City of Richmond v. Commission on State Mandates* (1998) 64 Cal.App.4th 1190, 1197 [75 Cal.Rptr.2d 754].)

In *City of San Jose v. State of California, supra,* 45 Cal.App.4th 1802, Government Code section 29550 authorized counties to charge cities and other local entities for costs of booking into county jails persons who had been arrested by employees of the cities and other entities. (45 Cal.App.4th at p. 1806.) The State argued the measure merely reallocated booking costs, no shifting from state to local entities, therefore not within article XIII B, section 6. (45 Cal.App.4th at p. 1806.) The city contended counties function as agents of the state, charged with enforcement of state's criminal laws; detaining and booking integral part of this process. (*Id.* at p. 1808.) The Commission found maintenance of jails and detention of prisoners, had always been a local matter, and cities and counties were both forms of local government; therefore, there was no shift in costs between *state* and local entities.

Furthermore, the terms of Government Code section 29550 were discretionary, not mandatory. (*City of San Jose v. State of California, supra,* 45 Cal.App.4th at pp. 1808–1809.) *City of San Jose* found no cost had been improperly transferred to the local government entities because the cost of capture, detention and housing of persons charged with crimes had traditionally been borne by the counties. (*Id.* at p. 1813.) *City of San Jose* rejected the cities' argument that the county was acting as agent of the state because it was "not supported by recent case authority, nor does it square with definitions particular to subvention analysis." (*Id.* at p. 1814.) California Constitution article XIII B treated cities and counties alike; Government Code section 17514 defines "costs mandated by the state" to mean any increased costs that a "local agency" is required to incur. Because both cities and counties were to be treated alike for purposes of subvention analysis, nothing in article XIII B, section 6 prohibits the shifting of costs between local government entities. (*City of San Jose*, at p. 1815.)

In *County of Los Angeles v. State of California, supra,* 43 Cal.3d 46, Labor Code sections 4453, 4453.1 and 4460, increased the maximum weekly wage upon which temporary and permanent disability indemnity was computed from $231 to $262.50 per week. In addition, Labor Code section 4702 increased certain death benefits from $55,000 to $75,000. The trial court held that because the changes did not exceed costs of living changes, they did not create an "increased level of service." (43 Cal.3d at p. 52.) The County argued the terms of California Constitution article XIII B, section 6, do not contain an exception for increased costs which do not exceed the inflation rate. (43 Cal.3d at p. 53.) The County relied on certain repealed Revenue and

Taxation Code definitions which had equated any program which imposed "additional costs" as being within the constitutional provision of "increased level of service." (*Id.* at p. 53.) *County of Los Angeles* rejected this interpretation. "If the Legislature had intended to continue to equate 'increased level of service' with 'additional costs,' then the provision would be circular: 'costs mandated by the state' are defined as 'increased costs' due to an 'increased level of service,' which, in turn, would be defined as 'additional costs.' " (*Id.* at p. 55.) An examination of the language of California Constitution article XIII B, section 6 shows that "by itself, the term 'higher level of service' is meaningless." (*Id.* at p. 56) Rather, it must be read in conjunction with the phrase " 'new program.' " (*Ibid.*) "Thus read, it is apparent that the subvention requirement for increased or higher level of service is directed to state mandated increases in the services provided by local agencies in existing 'programs.' " (*Ibid.*) By "program," the voters meant "programs that carry out the governmental function of providing services to the public, or laws which, to implement a state policy, impose unique requirements on local governments and do not apply generally to all residents and entities in the state." The ballot materials provided that article XIII B, section 6 would "not allow the state government to *force programs* on local governments without the state paying for them." (43 Cal.3d at p. 56.) "Laws of general application are not passed by the Legislature to 'force' programs on localities." (*Id.* at p. 57.) In light of this, "[t]he language of section 6 is far too vague to support an inference that it was intended that each time the Legislature passes a law of general application it must discern the likely effect on local governments and provide an appropriation to pay for any incidental increase in local costs ... If the electorate had intended such a far-reaching construction of section 6, the language would have explicitly indicated that the word 'program' was being used in such a unique fashion." (*Id.* at p. 57.) Therefore, there was no need to pay for the increase in worker's compensation, because it is not a program administered by local agencies to provide service to the general public. Local government entities are indistinguishable in this respect from private employers. (*Id.* at pp. 57–58.)

In *City of Sacramento v. State of California, supra,* 50 Cal.3d 51, chapter 2 of Statutes of 1978 extended mandatory coverage under the state's unemployment insurance laws to include state and local governments and nonprofit organizations. *City of Sacramento* held there was no obligation on the part of the state to provide funds because there was no "unique" obligation imposed upon local governments, nor was there any requirement of new or increased governmental services. (50 Cal.3d at p. 57.) As the court stated, the measure was adopted to conform California's system to federal laws. (*Id.* at p. 58.) Because the measure required local governments to provide unemployment benefits to their own employees, the state had not compelled provision of a new or increased level of service to the public at the local level. Rather, it had merely required local government to provide the same benefits as private

employers. (*Id.* at p. 67.) The purpose of California Constitution article XIII B, section 6 was to avoid governmental programs from being forced on localities by the state: Therefore, programs which are not unique to the government do not qualify. (50 Cal.3d at p. 67.) The benefits at issue here have nothing to do with the provision of governmental services, and are therefore not within the scope of section 6. (50 Cal.3d at p. 68.)

In *Lucia Mar Unified School District v. Honig, supra,* 44 Cal.3d 830, Education Code section 59300 required school districts to contribute part of the cost of educating pupils from the district at state schools for the severely handicapped. *Lucia Mar* held section 59300 constituted a "new" program of higher level of service because cost of program had been shifted from the state to a local entity. "The intent of the section would plainly be violated if the state could, while retaining administrative control of programs it has supported with state tax money, simply shift the cost of the programs to local government on the theory that the shift does not violate section 6 of [California Constitution] article XIIIB because the programs are not 'new.' " (44 Cal.3d at p. 836.)

On the other hand, in *County of San Diego v. State of California, supra,* 15 Cal.4th 68, pursuant to 1982 legislation, the state withdrew from counties Medi-Cal funding for medically indigent persons (MIP's). (*Id.* at pp. 79–80.) To offset this change in coverage, the state set up an account as a mechanism to transfer state funds to counties to pay for Medi-Cal expenses, and sufficient funds had been available in this account to enable the state to fully fund San Diego County's Medi-Cal costs. (*Id.* at p. 80.) However, in fiscal year 1990–1991, insufficient funds were available. (*Ibid.*) The state argued that no mandate for reimbursement existed because the counties had always borne the responsibility of paying for indigent medical care pursuant to Welfare & Institutions Code section 17000. (*County of San Diego* at pp. 91–92.) In finding reimbursement was mandated, the Supreme Court found that at the time California Constitution article XIII B, section 6 was enacted, the state was fully funding Medi-Cal for MIP's and the County bore no responsibility for those costs. (*County of San Diego* at p. 93.) Thus, in enacting Medi-Cal, the Legislature had shifted the cost of indigent medical care from the counties to the state. (*Id.* at pp. 96–97.) Given this background, the Legislature excluded MIP's from Medi-Cal, knowing full well that it would trigger the counties' obligation to pay for medical care as providers of last resort. (*Id.* at p. 98.) Therefore, the 1982 legislation "mandated a ' "new program" ' on counties by 'compelling them to accept financial responsibility in whole or in part for a program,' i.e., medical care for adult MIP's, 'which was funded entirely by the state before the advent of article XIII B.' " (*County of San Diego v. State of California, supra,* 15 Cal.4th 68 at p. 98, citing *Lucia Mar Unified School District v. Honig, supra,* 44 Cal.3d at p. 836.) Otherwise, " 'County taxpayers would be forced to accept new taxes or see the county

forced to cut existing programs further ....' " (*County of San Diego v. State of California, supra,* 15 Cal.4th 68 at p. 98.)

The Commission relies heavily on *County of Sonoma v. Commission on State Mandates, supra,* 84 Cal.App.4th 1264 [101 Cal.Rptr.2d 784]. In *County of Sonoma,* the challenged legislation added section 97.03 to the Revenue and Taxation Code, and reduced the amount of property tax revenue to be allocated to local government pursuant to a formula, allocating an equal portion to a "Educational Revenue Augmentation Fund (ERAF)" for distribution to school districts. (84 Cal.App.4th at pp. 1269–1270, 1275.) The net effect of the legislation was to decrease counties' tax revenues, although school revenues remained stable, and satisfied the constitutional necessity of maintaining a minimum level of funding for schools pursuant to California Constitution article XVI, section 8. (84 Cal.App.4th at p. 1276.) In *County of Sonoma,* the County argued that the reallocation of tax revenues constituted a state-mandated cost of a new program. (*Id.* at p. 1276.) The court held that section 6 subvention was limited to "increases in actual costs." Because none of the County's tax revenues were expended, the legislation did not come within section 6. "Proposition 4 [the initiative enacting article XIII B] was aimed at controlling and capping government spending, not curbing changes in revenue allocations. Section 6 is an obvious [complement] to the goal of Proposition 4 in that it prevents the state from forcing extra programs on local governments in a manner that negates their careful budgeting of expenditures. A forced program that would negate such planning is one that results in increased actual expenditures of limited tax proceeds that are counted against the local government's spending limit. Section 6, located within a measure aimed at limiting expenditures, is expressly concerned when 'costs' incurred by local government as a result of state-mandated programs, particularly with the costs of compliance with a new program *restrict local spending in other areas.*" (84 Cal.App.4th at pp. 1283–1284 (italics added).)

*County of Sonoma* discerned a further requirement of California Constitution article XIII B, section 6 : that the costs incurred must involve programs previously funded exclusively by the state. In imposing this limitation, *County of Sonoma* relied on language in *County of San Diego v. State of California, supra,* 15 Cal.4th 68, that "section 6 prohibits the state from shifting to counties the costs of state programs for which the state assumed complete financial responsibility before adoption of section 6." (*County of San Diego v. State of California, supra,* 15 Cal.4th 68 at p. 99, fn. 20.) *County of Sonoma* determined that because the statute at issue only involved a reallocation of funds between entities already jointly responsible for providing a service (education), no state-mandated reimbursable program existed. (*County of Sonoma v. Commission on State Mandates, supra,* 84 Cal.App.4th at p. 1289.)

Based upon the principles discernable from the cases discussed, we find that in the instant case, the legislation does not mandate a "higher level of service." ■ In the case of an existing program, an increase in existing costs does not result in a reimbursement requirement. Indeed, "costs" for purposes of California Constitution article XIII B, section 6, does not equal every increase in a locality's budget resulting from compliance with a new state directive. Rather, the state must be attempting to divest itself of its responsibility to provide fiscal support for a program, or forcing a new program on a locality for which it is ill-equipped to allocate funding.

We agree that POST certification is, for all practical purposes, not a "voluntary" program and therefore the County must, in order to comply with section 13519, add domestic violence training to its curriculum. POST training and certification is ongoing and extensive, and local law enforcement agencies may chose from a menu of course offerings to fulfill the 24-hour requirement. Adding domestic violence training obviously may displace other courses from the menu, or require the adding of courses. Officer downtime will be incurred. However, merely by adding a course requirement to POST's certification, the state has not shifted from itself to the County the burdens of state government. Rather, it has directed local law enforcement agencies to reallocate their training resources in a certain manner by mandating the inclusion of domestic violence training.

Furthermore, the state has not shifted from itself the cost of a program previously administered and funded by the state. Instead, the state is requiring certain courses to be placed within an already existing framework of training. This loss of "flexibility" does not, in and of itself, require the County to expend funds that previously had been expended on the POST program by the state. Instead, "[t]he purpose for which state subvention of funds was created, to protected local agencies from having the state transfer its cost of government from itself to the local level, is therefore not brought into play" by a directive that POST-certified studies include domestic violence training. (*Redevelopment Agency of the City of San Marcos v. Commission on State Mandates, supra,* 55 Cal.App.4th at p. 986.) Any increased costs are merely "incidental" to the cost of administering the POST certification.

While we are mindful that legislative disclaimers, findings and budget control language are not determinative to a finding of a state-mandated reimbursable program (*Carmel Valley Fire Protection District v. State of California* (1987) 190 Cal.App.3d 521, 541 [234 Cal.Rptr. 795]), our interpretation is supported by the hortatory statutory language that, "The instruction required pursuant to this subdivision shall be funded from existing resources available for the training required pursuant to this section. It is the intent of the Legislature not to increase the annual training costs of local

government entities." (§ 13519.) ■ Thus, while the County may lose some flexibility in tailoring its training programs, such loss of flexibility does not rise to the level of a state-mandated reimbursable program because the loss of flexibility is incidental to the greater goal of providing domestic violence training. Every increase in cost that results from a new state directive does not automatically result in a valid subvention claim where, as here, the directive can be complied with by a minimal reallocation of resources within the entity seeking reimbursement. Thus, while there may be a mandate, there are no increased costs mandated by section 13519.

## DISPOSITION

The judgment of the trial court is reversed. The trial court is directed to enter a new and different judgment denying the County's petition for writ of mandate and reinstating the findings of the Commission.

Perluss, P. J., and Woods, J., concurred.