[No. S145341. Nov. 5, 2007.]

CONSULTING ENGINEERS AND LAND SURVEYORS OF CALIFORNIA, INC., et al., Plaintiffs and Respondents, v. PROFESSIONAL ENGINEERS IN CALIFORNIA GOVERNMENT, Defendant and Appellant.

### COUNSEL

Law Office of Kelley Stimpel Martinez, Kelley Stimpel Martinez; Law Offices of James E. McGlamery and James E. McGlamery for Defendant and Appellant.

Olson, Hagel & Fishburn, Deborah B. Caplan, N. Eugene Hill and William B. Tunick for Don Perata, President Pro Tempore of the State Senate and Fabian Nunez, Speaker of the State Assembly as Amici Curiae on behalf of Defendant and Appellant.

Stoel Rives and James P. Corn for Plaintiffs and Respondents.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, James M. Humes, Chief Deputy Attorney General, Louis R, Mauro and Stacy Boulware Eurie, Assistant Attorneys General, Christopher E. Krueger, Catherine A. Van Aken, Vickie Pochelle Whitney and Leslie R. Lopez, Deputy Attorneys General, for California Department of Transportation as Amicus Curiae on behalf of Plaintiffs and Respondents.

### OPINION

**MORENO, J.**—In *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016 [56 Cal.Rptr.3d 814, 155 P.3d 226] (*Kempton*), we held that Proposition 35, which expressly removed a constitutional restriction on the ability of state agencies to contract with private firms for architectural and engineering services on public works projects, also impliedly repealed certain regulatory statutes pertaining to private contracting that were derived from the constitutional provision. The present case involves two participants from *Kempton*.[1] The question presented here is whether a provision of a memorandum of understanding between the state and a state employee union that restricts the use of private contractors for architectural and engineering services by public agencies fatally conflicts with Proposition 35 as we construed that initiative in *Kempton*. We answer that it does and, so, affirm the judgment of the Court of Appeal.

---

[1] In *Kempton,* Professional Engineers was a plaintiff and appellant, while Consulting Engineers was an intervener and respondent. (*Kempton, supra,* 40 Cal.4th at pp. 1026–1027.)

# I. STATEMENT OF THE CASE

## A. *Background: Proposition 35*

Proposition 35, entitled the Fair Competition and Taxpayer Savings Act, was passed by the electorate on November 7, 2000. The initiative included both constitutional and statutory provisions. The constitutional provision, California Constitution, article XXII consists of two sections. Section 1 provides in relevant part that the "State of California and all other governmental entities . . . shall be allowed to contract with qualified private entities for architectural and engineering services for all public works of improvement. The choice and authority to contract shall extend to all phases of project development including permitting and environmental studies, rights-of-way services, design phase services and construction phase services. The choice and authority shall exist without regard to funding sources whether federal, state, regional, local or private, whether or not the project is programmed by a state, regional or local governmental entity, and whether or not the completed project is a part of any State owned or State operated system or facility." (Cal. Const., art. XXII, § 1.) Section 2 provides: "Nothing contained in Article VII of this Constitution shall be construed to limit, restrict or prohibit the State or any other governmental entities, including, but not limited to, cities, counties, cities and counties, school districts and other special districts, local and regional agencies and joint power agencies, from contracting with private entities for the performance of architectural and engineering services." (Cal. Const., art. XXII, § 2.)

Article VII of the state Constitution, referred to in article XXII, section 2 of the state Constitution, establishes the state's merit-based civil service. Prior to the passage of Proposition 35, the courts had interpreted the civil service mandate of article VII as an implied limitation on the use of private contractors that was intended to protect the civil service from political patronage appointments. Article XXII, section 2 thus removed article-VII-based restrictions on contracting with private entities for architectural and engineering services by the State of California.

Proposition 35 also added a new chapter to the Government Code.[2] Additionally, section 5 of the initiative specified: "This initiative may be amended to further its purposes by statute, passed in each house by roll call vote entered in the journal, two-thirds of the membership concurring, and signed by the Governor." (Voter Information Guide, Gen. Elec. (Nov. 7, 2000) text of Prop. 35, § 5, p. 66.)

---

[2] These provisions (Gov. Code, § 4529.10 et seq.) are not at issue in this case.

### B. *Proceedings in the Trial Court*

On November 14, 2003, Consulting Engineers and Land Surveyors of California, Inc., John M. Humber, and Harris & Associates, Inc., filed an action against Professional Engineers in California Government, the Department of Personnel Administration (DPA), and its then director, Marty Morgenstern, the Department of Finance, and its then director, Steve Peace, and the Department of Transportation (Caltrans), and its then director, Jeff Morales.[3] The complaint sought injunctive and declaratory relief and a writ of mandate; it also included a taxpayer action.

The complaint identified the parties as follows: Consulting Engineers is a nonprofit corporation whose member firms perform consulting, architectural, engineering and land surveying services as private contractors with Caltrans. Humber is a taxpayer on whose behalf the taxpayer action was brought and Harris is a corporation that had contracts with Caltrans for construction support services. Professional Engineers is the "duly certified collective bargaining representative for members of state employee Bargaining Unit 9" (Unit 9). DPA is "the State agency responsible to conduct negotiations and enter into collective bargaining agreements with the exclusive bargaining units pursuant to the terms and provisions of the State Employer/Employee Relations Act." The Department of Finance is the state agency "responsible for supervision over the financial and business policies of the State." Caltrans is the state agency "responsible for administering the transportation facilities of the State, including decisions for contracting out architectural and engineering services."

Consulting Engineers alleged that the state, through the DPA, had entered into a memorandum of understanding (MOU) with Professional Engineers, approved by the Legislature as Assembly Bill No. 977 (2003–2004 Reg. Sess.) and signed by then Governor Davis. Consulting Engineers alleged further that the MOU contained a provision that violated California Constitution, article XXII, the constitutional provision added by Proposition 35. The MOU was attached as an exhibit to the complaint.

The provision in question, article 24 of the MOU (article 24), captioned "Contracting Out," consists of seven sections. Article 24, paragraph A, states: "[Professional Engineers] has presented evidence that State Departments are presently contracting out work appropriately done by Unit 9 employees, and that said contracting results in unnecessary additional costs to the State. Thus, the purpose of this section is to guarantee that the State does not incur

---

[3] The parties will be collectively referred to as Consulting Engineers and Professional Engineers except where individual specification is necessary for clarity.

unnecessary, additional costs by contracting out work appropriately performed at less expense to the state by Unit 9 employees, consistent with the terms of this section. In achieving this purpose the parties do not intend this section to expand the State's ability to contract out for personal services. The parties agree that this section shall not be interpreted or applied in a manner which results in a disruption of services provided by State departments."

Paragraph B of article 24 states: "Except in extremely unusual or urgent, time-limited circumstances, or under other circumstances where contracting out is recognized or required by law, Federal mandate, or court decisions/orders, the State must make every effort to hire, utilize and retain Unit 9 employees before resorting to the use of private contractors. Contracting may also occur for reasons other than cost savings as recognized or required by law, Federal mandate, or court decisions/orders."

Paragraph C of article 24 requires that state agencies provide Professional Engineers with "copies of Requests for Proposals . . . and Invitations for Bid . . . for personal services contracts . . . if they call for services found in Unit 9 class specifications" in order "to provide [Professional Engineers] with notice and an opportunity to present alternatives which mitigate or avoid the need for contracting out, while still satisfying the needs of the State to provide services." Department directors or their representatives are required to meet with Professional Engineers at its request for this purpose.

Paragraph D of article 24 establishes a "joint Labor/Management Committee" of which half the members are to be drawn from Professional Engineers, while the remaining half consists of "representatives of . . . the [DPA], the Department of Finance and affected departments." The committee is tasked with a review of all then existing contracts with private entities that called for services found in Unit 9 class specifications. Upon obtaining this information, the committee is to "examine the contracts based on the purpose of this section, the terms of the contracts, all applicable laws, Federal mandates and court decisions/orders. In this regard, the Committee will consider which contracts should and can be terminated immediately, which contracts will take additional time to terminate, which contracts may continue (for how long and under what conditions) and how (if necessary and cost effective) to transition contract employees or positions into civil service. All determinations shall be through express mutual agreement of the Committee." Remaining provisions of paragraph D involve distribution of any savings that accrued from termination of personal service contracts.

Paragraph E of article 24 states as its "objective . . . ensur[ing] that Unit 9 employees have preference over contract employees" and, to that end, "the appointing power shall review all existing personal services contracts to

determine if work consistent with the affected employee's classification is being performed by a contractor . . . . If the joint Labor/Management Committee that reviews personal services contracts determines that the terms and purpose of the contract permit the State to assign the work to a Unit 9 employee who would otherwise be displaced, this shall be implemented consistent with the other terms of this section."

Paragraph F exempts the Department of Corrections from article 24 "until such time as it has been approved by the Federal court special master(s)."

Finally, paragraph G of article 24 provides: "The State is mindful of the constitutional and statutory obligations (e.g., Government Code § 19130) as it pertains to restrictions on contracting out. Thus, nothing in this section is intended to interfere with pursuit of remedies for violation of these obligations as provided by law (e.g. Public Contract Code § 10337.)"

According to Consulting Engineers's complaint, article 24 violates article XXII of the state Constitution because article XXII "vests the authority to make contracting out decisions in State agencies, not a committee created as a result of a bargaining process."

In their joint answer to Consulting Engineers's complaint, the Department of Finance and Caltrans agreed that, as to Professional Engineers, plaintiffs were entitled to the relief they sought including a declaration of the unconstitutionality of article 24, injunctive relief and a writ of mandate prohibiting implementation of article 24. Professional Engineers answered with a general denial of the allegations of the complaint, as did the DPA.

On July 30, 2004, following a court trial, the trial court granted declaratory relief and issued a permanent injunction and a writ of mandate against Professional Engineers finding that "Article 24 of the Unit 9 MOU, as approved and enacted by the Legislature in AB 977, violates Article XXII of the state Constitution . . . ." The trial court explained: "Article 24 of the Unit 9 [MOU] deals directly with the issue of contracting for architectural and engineering services . . . Article 24 . . . establishes a policy that these civil service employees should be preferred over the use of private contractors. (Article 24, Paragraphs B and E.) It further establishes a procedure through which civil service employee representatives are to be given prior notice of potential outside contracts and the opportunity to present alternatives to them before they are awarded. (Article 24, Paragraph C.) Beyond that, it also establishes a procedure in which a joint committee of civil service employee representatives and management is required to review existing outside contracts and determine when and how to terminate such contracts on grounds that are not specified in the Article itself, as well as how to transition contract employees into civil service positions. (Article 24, Paragraph D.) Article 24 also includes a procedure under which outside contracts will be terminated in order to

avoid displacement of civil service employees. (Article 24, Paragraph E.) [¶] These provisions of Article 24 limit the ability of the State to contract freely for architectural and engineering services. Moreover, they do so in order to advance the interests of state civil service employees. They therefore are, on their face, directly in conflict with Article XXII. . . . Article 24 also may not be viewed as a proper amendment of Article XXII, because it does not further the purposes of Article XXII and it was not passed by a two-thirds vote of the Legislature. (See Section 5 of the Initiative Measure (Prop. 35).) Article 24 must therefore be declared as invalid as prayed by petitioner."

Professional Engineers appealed. A divided Court of Appeal affirmed the judgment. The majority concluded that article 24's provisions "restrict the ability of state authorities to freely contract out engineering services. The mandatory preference for civil service engineers, without a concomitant requirement of cost savings, does not ensure the best value for California taxpayers, and it undermines the goal of promoting fair competition. Moreover, common sense dictates that the review and termination of existing contracts is not conducive to speeding the completion of backlogged projects. In other words, [article] 24 contravenes the goals of Proposition 35 and thwarts the intent of the electorate."

The dissent argued that article 24 was consistent with the authority granted to the state by Proposition 35 to choose whether to contract with private entities for architectural and engineering services because it represented a choice by the state to restrict its authority to do so. "Certainly, in light of the Constitution, the contracting limitations set forth in the MOU could not have been forced on the state. However, in this instance, the limitations were not imposed; the state *agreed* to them."

We granted Professional Engineers's petition for review.

## II.  ANALYSIS

### A.  *Introduction*

In its initial briefing, which preceded our decision in *Kempton*, Professional Engineers raised many of the same arguments it had raised in *Kempton*, and which we considered and rejected there. After we issued *Kempton*, we sought supplemental briefing from the parties on its impact on this case. Professional Engineers' supplemental briefs abandon most of its initial arguments and advance arguments that are both new and inconsistent with its previous arguments. Nonetheless, we consider and dispose of these now apparently

superseded arguments because this discussion provides the necessary context for discussing the arguments presented in Professional Engineers's supplemental briefs.

## B. Kempton

Professional Engineers contends that the Legislature's approval of the MOU in which article 24 appears represents a valid exercise of the expanded authority conferred on the Legislature by Proposition 35 to set policy with respect to private contracting by state agencies. This contention is supported by a series of predicate arguments. Professional Engineers argues that the intent of the electorate in enacting Proposition 35 was to expand the power of the Legislature to decide whether to authorize individual agencies to contract with private entities for architectural and engineering services rather than permit the agencies themselves to make those decisions. This argument, in turn, is premised on Professional Engineers's interpretation of the phrase "State of California" in section 1 of article XXII of the state Constitution as referring only to the Legislature. As a corollary, Professional Engineers maintains that any broader construction of that phrase to include executive agencies violates the separation of powers doctrine by shifting legislative authority to set policy regarding private contracting from the Legislature to such agencies. In this same vein, assuming that Proposition 35 did no more than expand legislative authority to set policy for private contracting, Professional Engineers maintains that we, as an appellate court, are required to broadly construe that expansion of authority.

In *Kempton*, we decided whether Proposition 35 impliedly repealed certain statutory regulations on private contracting when it removed the constitutional restriction from which those statutes were derived. Those provisions included Government Code sections 14101, 14130 et seq. and 19130. Each statute incorporated an exception to the general principle that article VII of the state Constitution prohibited the use of private contractors to perform state functions in order to preserve the merit-based civil service system. Those exceptions included the " 'nature of the services' rule," the " 'new state function' rule," and the " 'cost savings exception.' " (*Kempton, supra*, 40 Cal.4th at p. 1033.)

We concluded that Proposition 35 impliedly repealed these statutes when it expressly repealed the constitutional restriction judicially construed from article VII of the state Constitution because the provisions of Proposition 35, authorizing private contracting free of article VII's restrictions, "cannot be reconciled with the existing statutes that authorize private contracting by Caltrans of architectural and engineering services, subject to conditions derived from the exceptions to article VII's rule generally restricting such

contracting. That rule has been abrogated by Proposition 35 and if the rule no longer has any force, neither should its exceptions." (*Kempton, supra,* 40 Cal.4th at p. 1041.)

█ In light of this conclusion, we rejected Professional Engineers' argument that the purpose of Proposition 35 was merely to remove the constitutional restriction on the *Legislature's* plenary authority to regulate private contracting based on its assertion that reference to the "State of California" in California Constitution, article XXII was to the Legislature alone. We pointed out that, constitutionally, the legislative power in California is shared by the Legislature and the electorate acting through its powers of initiative and referendum, not exclusively exercised by the Legislature. (*Kempton, supra,* 40 Cal.4th at p. 1042.)

█ Then, because applying "fundamental principles of construction, applicable equally to constitutional provisions, statutes and initiatives, require[s] us to give words in such texts their ordinary meanings" we concluded that "the phrase 'State of California,' as it refers to state government, includes all three branches—legislative, executive and judicial. (See Cal. Const., art. III, § 3.) Thus, section 1, in tandem with section 2, of article XXII grants all three branches of government the authority to contract with private entities for architectural and engineering services unimpeded by article VII restrictions." (*Kempton, supra,* 40 Cal.4th at p. 1043.)

We next considered and rejected Professional Engineers' separation of powers argument. "[Our] interpretation of Proposition 35 does not endorse a shift of policymaking powers from the legislative branch to executive branch agencies. Rather, it recognizes that there has been a policy determination, made by a constitutionally empowered legislative entity, the electorate acting through its initiative power, to permit those agencies to contract for architectural and engineering services free of article-VII-derived limitations." (*Kempton, supra,* 40 Cal.4th at pp. 1044–1045.)

Professional Engineers renews these arguments in the different context of this case. Professional Engineers argues that the conclusion of the Court of Appeal that article 24 violated Proposition 35 interferes with the Legislature's prerogative to set policy in the realm of private contracting and, by "giv[ing] the Legislature's plenary power to individual state department[s] . . . violate[s] the separation of powers doctrine."

█ As in *Kempton,* Professional Engineers erroneously assumes that the Legislature not only has plenary, but *exclusive,* authority to set state policy for private contracting when, in fact, that authority is shared by the electorate. It was the electorate, not the Court of Appeal in this case, that removed

California Constitution, article VII's restriction on private contracting and statutory exceptions to that restriction in order to permit the unfettered use of private entities for architectural and engineering services should the agency choose to exercise its authority to do so. (*Kempton, supra,* 40 Cal.4th at pp. 1037–1039.) Further, the electorate also chose to limit the Legislature's ability to set policy in this area by providing that amendments to the initiative must further the purposes of the initiative and be passed by a two-thirds majority of each house. (Prop. 35, § 5.) Such a limitation is well within the power of the electorate. (*Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1251 [48 Cal.Rptr.2d 12, 906 P.2d 1112].) These legislative choices by the electorate are entitled to the same deference by the courts as enactments of the Legislature. (*Kempton, supra,* 40 Cal.4th at pp. 1042–1043.)

Therefore, the question is not the Legislature's authority to set policy in this area but whether the Legislature's actions are consistent with Proposition 35. It is to that question we turn.

### C. Article 24 As a Self-imposed Legislative Restriction on Private Contracting

Professional Engineers asserts: "Proposition 35 grants authority to the Legislature to choose to contract out under circumstances that were previously restricted by Article VII. Accordingly, Proposition 35 authorizes the Legislature to choose to voluntarily approve the alleged contracting out restrictions reflected in Article 24." Elaborating on this assertion, Professional Engineers explains: "Specifically, because Proposition 35 *permits* the Legislature [to] choose contracting out policies and procedures for the State, contracting out is not mandated. Thus, choosing to voluntarily restrict contracting does not change or amend the grant of authority given by the initiative and the Legislature's contracting out policy choice reflected in Article 24 is consistent with Proposition 35's grant of authority."

Consulting Engineers counters that, because approval of the MOU was a legislative amendment to the initiative, it failed to comply with section 5 of Proposition 35, which permits such amendment only to "further [the] purposes" of Proposition 35 and which requires a two-thirds vote of each house. (Voter Information Guide, Gen. Elec. (Nov. 7, 2000) text of Prop. 35, § 5, p. 66.) We do not agree that the MOU was, or could have been, an amendment of the initiative. The operative principle applicable here is that the Legislature cannot take action, whether by statute or MOU, that contravenes a constitutional provision. (See *California State Personnel Bd. v. California State Employees Assn., Local 1000, SEIU, AFL-CIO* (2005) 36 Cal.4th 758, 774 [31 Cal.Rptr.3d 201, 115 P.3d 506] ["In adopting the constitutional merit principle, California voters made clear their intent that

permanent civil service appointments and promotions be made solely on the basis of merit. No matter what discretion the Legislature has purported to give or withdraw from appointing powers, it does not have a free hand to approve MOU's or enact statutes that flout this mandate"]; *County of Fresno v. State of California* (1991) 53 Cal.3d 482, 493 [280 Cal.Rptr. 92, 808 P.2d 235] [" ' " 'legislation must be subordinate to the constitutional provision, and in furtherance of its purpose, and must not in any particular attempt to narrow or embarrass it' " ' "].)

Article 24 revives some of the restrictions on the ability of state agencies to enter into private contracts for architectural and engineering services contained in the statutes that we held in *Kempton* were impliedly repealed by Proposition 35. For example, article 24, paragraph B proposes a limitation upon private contracting "[e]xcept in extremely unusual or urgent, time-limited circumstances," or if otherwise required by "law, Federal mandate, or court decisions/orders . . . ." The "time-limited circumstances" language echoes language in Government Code section 14101, which authorizes private contracting if "obtainable staff is unable to perform the particular work within the time the public interest requires such work to be done." (Gov. Code, § 14101.) Similarly, Government Code section 14130 permits private contracting by Caltrans "whenever the department is inadequately staffed to satisfactorily carry out its program of project study reports, project development, surveying, and construction inspection in a timely and effective manner." (Gov. Code, § 14130, subd. (b).) In both article 24 and these statutes, then, the availability of private contracting is tied to the inability of the agency to perform its functions in a timely manner using state employees. In *Kempton* we concluded that both Government Code sections 14101 and 14130 were derived from California Constitution, article VII restrictions on private contracting and were impliedly repealed by Proposition 35. (*Kempton, supra,* 40 Cal.4th at pp. 1037–1041.)

We reached the same conclusion with respect to Government Code section 19130. (*Kempton, supra,* 40 Cal.4th at pp. 1037–1041.) Among the provisions of that statute is the requirement that such contracts not displace civil service employees. "The term 'displacement' includes layoff, demotion, involuntary transfer to a new class, involuntary transfer to a new location requiring a change of residence, and time base reductions." (Gov. Code, § 19130, subd. (a)(3).) A similar requirement is found in Government Code section 14131: "Services contracted for shall not cause the displacement of any permanent, temporary, or part-time employee of the department. [¶] For purposes of this section, 'displacement' means layoff, demotion, involuntary transfer to a new class, or involuntary transfer to a new work location requiring the employee to change his or her place of residence in order to be able to continue in his or her job classification." Paragraph E of article 24

similarly limits the use of private contracting where it would cause displacement of Unit 9 employees and defines displacement in much the same language as the statutes quoted above: "Displacement includes layoff, involuntary demotion, involuntary transfer to a new class, involuntary transfer to a new location requiring a change of residence, and time base reductions."

█ In short, the limitations on private contracting by public agencies imposed by article 24 reflect the spirit and to some extent the letter of those California Constitution, article-VII-derived statutes that we held in *Kempton* had been impliedly repealed by Proposition 35. Thus, legislative approval of the MOU, in addition to not complying with section 5 of Proposition 35, violates the constitutional mandate of article XXII of the California Constitution, which abolished article VII's restrictions on the ability of agencies to use private contractors for architectural and engineering services.

### D. Article 24 As a Self-imposed Executive Restriction on Private Contracting

As noted, following our decision in *Kempton*, we sought supplemental briefing from the parties on the impact of that decision on this case. In its supplemental briefing, Professional Engineers performs a volte-face. While maintaining that article 24 represents a legitimate policy choice regarding private contracting, it abandons its claim that the Legislature was empowered by Proposition 35 to make this choice and now maintains that this authority resides in the executive branch. Indeed, Professional Engineers now contends that the Legislature was not required to approve the MOU that contained article 24 at all. Professional Engineers also attempts to characterize article 24 as nothing more than a mechanism for gathering and analyzing data pertaining to private contracting, and specifically asserts that article 24 does not authorize termination of such contracts, now or in the future. Additionally, Professional Engineers maintains that article 24 does not contain the kind of article VII restrictions that we discussed in *Kempton* because the purpose of article 24 is not to promote the merit-based civil service system as was the judicially construed purpose of the article VII restrictions. We reject these arguments.

Professional Engineers's attempt to locate the authority for the restrictions on private contracting found in article 24 in the executive branch rather than the Legislature founders on two points. First, as we made clear in *Kempton*, Proposition 35 applies equally to all three branches of government: executive, legislative and judicial. (*Kempton, supra*, 40 Cal.4th at p. 1042.) Thus, executive branch agencies are no more at liberty to violate California Constitution, article XXII by reviving California Constitution, article-VII-based restrictions under the guise of collective bargaining than is the

Legislature.[4] Second, as we demonstrated in the prior part, the restrictions imposed by article 24 on the use of private contractors appear to be based on the California Constitution, article-VII-derived statutes that we concluded in *Kempton* had been impliedly repealed by Proposition 35. Professional Engineers's assertion that the purpose of article 24, unlike the judicially construed article VII restriction, is not to promote the merit-based civil service system draws a distinction without a difference. We agree with the Court of Appeal majority that "[t]he effect of [article 24] is to restrict the ability of state authorities to freely contract out [architectural and] engineering services," and that, therefore, article 24 "contravenes the goals of the Proposition 35 and thwarts the intent of the electorate."

Like the Court of Appeal, we also reject Professional Engineers's attempts to recast the purpose of article 24 as merely an innocuous mechanism for gathering and analyzing data on private contracting. The plain language of article 24—allowing as it does for termination of private contracts and clearly serving to protect the interests of state employees—belies this interpretation. As the Court of Appeal majority noted, "By any measure, [article 24 imposes] significant restrictions on the ability of a state entity to contract out for architectural and engineering services on public works projects now and in the future."

Lastly, we note Professional Engineers's curious argument that, because by its terms article 24 "is not triggered when contracting out is recognized or required by law," and Proposition 35 now allows such private contracting, article 24's preference for using state employees "does not violate Proposition 35 because that preference does not apply when the 'law' and 'court decisions' (such as the *Kempton* decision) 'recognize' contracting out." This argument appears to amount to a concession that any provisions of article 24 in conflict with Proposition 35 as we construed that initiative in *Kempton* are a nullity.

---

[4] In their supplemental brief, the leadership of the Legislature as amici curiae, argues that this reasoning converts the discretion of executive agencies to use private firms for architectural and engineering services to a mandate. This is the same argument made by the dissenting justice in the Court of Appeal who characterized the majority's holding as requiring the state to contract with private entities for architectural and engineering services. This is not accurate. Our holding does not compel state agencies to enter into such contracts. Under Proposition 35, state agencies have the choice and authority to use private contractors so, clearly, they can choose not to if they conclude that a particular public works project can be more efficiently performed by civil service employees. Moreover, Proposition 35 does not preclude state agencies from imposing conditions consistent with Proposition 35 on private contractors that perform such work. What the state may not do is to impair an individual agency's choice to engage in private contracting in derogation of the authority conferred on it by Proposition 35. Neither the Governor nor the Legislature, separately or jointly, can undo by MOU what the electorate enacted through Proposition 35.

## III.   CONCLUSION

We affirm the judgment of the Court of Appeal.

George, C. J., and Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.